**COLE SCHOTZ P.C.**
Michael D. Sirota
David M. Bass
Andreas D. Milliaressis
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
dbass@coleschotz.com
amilliaressis@coleschotz.com

*Counsel to BPT 50S Funding LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>50 SUSSEX REDEVELOPMENT URBAN RENEWAL LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 26-17635 (MBK) |

**MOTION OF BPT 50S FUNDING LLC FOR ENTRY OF AN ORDER (I) GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§ 362(D)(1) AND (D)(3) AND (II) GRANTING RELATED RELIEF**

BPT 50S Funding LLC ("BPT"), by and through its undersigned counsel, hereby files this *Motion of BPT 50S Funding LLC for Entry of an Order (I) Granting Relief From the Automatic Stay Pursuant to 11 U.S.C. §§ 362(d)(1) and (d)(3) and (II) Granting Related Relief* (the "Motion"), and in support thereof relies on the *Declaration of Ian V. Lagowitz in Support of Motion of BPT 50S Funding LLC for Entry of an Order (I) Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. §§ 362(d)(1) and (d)(3) and (II) Granting Related Relief* (the "Lagowitz Declaration"), attached hereto as **Exhibit A**, and respectfully states as follows:

## RELIEF REQUESTED

1. BPT seeks entry of an order, substantially in the form attached hereto as **Exhibit B** (the "Proposed Order"), pursuant to sections 362(d)(1) and (d)(3) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 4001-1 and 9013-1 of the Local Rules for the United States Bankruptcy Court for the District of New Jersey (the "Local Rules") granting BPT (i) relief from the automatic stay and (ii) related relief.

## JURISDICTION AND VENUE

2. The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.). This Motion is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), as it concerns the administration of the Debtor's bankruptcy estate.

3. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4. On October 1, 2024, BPT entered into a loan agreement (the "Loan Agreement") with 50 Sussex Redevelopment Urban Renewal LLC (the "Debtor"), pursuant to which BPT and Israel Discount Bank of New York loaned the Debtor $62,500,000 secured by the Debtor's real property located at 50-54 Sussex Avenue, Newark, New Jersey 07103 (the "Property").

5. The Debtor defaulted on its obligations under the Loan Agreement no later than November 1, 2025. Specifically, the Debtor failed to maintain required reserves, missed months of interest payments, misrepresented budget information, made unauthorized distributions, and failed to timely fulfill its reporting obligations under the Loan Agreement.

6. Although it failed to perform its obligations under the Loan Agreement, the Debtor nonetheless made repeated promises to BPT that it would be able to refinance its indebtedness under the Loan Agreement. However, despite the Debtor's assurances, this promise was never fulfilled.

7. Finally, after months of delay, on March 23, 2026, BPT commenced a commercial foreclosure action in the Superior Court of New Jersey, Chancery Division, Essex County, captioned *BPT 50S Funding LLC, as Administrative Agent v. 50 Sussex Redevelopment Urban Renewal LLC, Domenick Tonacchio, 50 Sussex Manager, LLC, Tona Property Management LLC, and Tona Development Group LLC*, Docket No. SWC-F-003318-26 (the "Foreclosure Action").

8. In the Foreclosure Action, the Debtor and BPT agreed upon terms to appoint a rent receiver. Accordingly, on July 1, 2026, the Honorable Arthur J. Batista, J.S.C., entered an order appointing a rent receiver for the Property. However, despite agreeing on terms for the appointment of a rent receiver, on that same date (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court. [Docket No. 1], further frustrating BPT's efforts to recover on the amounts owed to it under the Loan Agreement.

9. After the Petition Date, on July 7, 2026, the Debtor filed its *Motion of the Debtor and Debtor-in-Possession for Authority to Use Cash Collateral* [Docket No. 12] (the "Cash Collateral Motion"). BPT opposed the Cash Collateral Motion, alerting the Court to the Debtor's history of nonpayment and pointing out that the Debtor's rents were not property of the estate. *See* Docket No. 15.

10. A hearing was held on the Cash Collateral Motion on July 13, 2026, following which the Court denied the Cash Collateral Motion and appointed Ian V. Lagowitz as rent receiver (the "Receiver"). *See* Docket No. 45 (the "Receivership Order"). At the hearing, the Court

recognized that "[t]his is a single-asset real estate case," in which "[t]he Debtor has the 90 days to come up with a plan that's confirmable." July 13, 2026 Hr'g Tr. 23:19, 24:7–8, attached hereto as **Exhibit C**. The Court reminded the Debtor of this obligation as recently as September 17, 2026 in connection with BPT's motion to dismiss the adversary proceeding captioned as *50 Sussex Redevelopment Urban Renewal, LLC v. Bravo Capital, LLC and BPT 50S Funding LLC*, Case No. 26-01323 (MBK) (the "Adversary Proceeding"), wherein the Court advised the Debtor, "[w]e're in a single-asset real estate case and your deadline's approaching." Sept. 17, 2026 Hr'g Tr. 30:5-6, attached hereto as **Exhibit D.**

11. On October 1, 2026, more than ninety days since the Petition Date, the Debtor filed the *Plan of Reorganization Proposed by 50 Sussex Redevelopment Urban Renewal LLC* [Docket No. 81] (the "Proposed Plan"). Despite the clear requirements of the Bankruptcy Code, discussed below, the Debtor failed to timely file a confirmable plan and has not commenced making monthly interest payments to BPT.

12. Furthermore, the Debtor has impaired BPT's rights in its collateral by thoroughly failing to comply with its obligations under this Court's Receivership Order. On September 25, 2026, the Receiver filed his *Receiver's Motion for (I) Secondary Appointments for the Receiver; (II) Enforcement of the Receivership Order and Compelling Performance by Debtor Under the Receivership Order; and (III) Granting Related Relief* [Docket No. 76] (the "Receiver Motion"). In support of the Receiver Motion, the Receiver submitted the *Declaration of Ian V. Lagowitz in Support of Motion for (I) Secondary Appointments for the Receiver and (II) Enforcement of the Receivership Order, Including Compelling Turnover and Accounting and Related Relief* [Docket No. 76-4] (the "Receiver Declaration"), which is incorporated herein by reference.

13. As set forth in the Receiver Declaration, the Debtor has failed to furnish financial reports to the Receiver, frustrated the Receiver's attempts to operate and manage the Property by refusing to provide the account information necessary for the Receiver to access the Property, and engaged in numerous suspicious and troubling transactions. Receiver Declaration ¶¶ 21–24. The Debtor has also ceased paying insurance premiums, and refuses to release funds to the Receiver to enable him to make such payments. *Id.* ¶ 28.

14. In addition to the Debtor's flagrant dereliction of its obligations to the Receiver, BPT is deeply concerned by the Debtor's apparent failure to adhere to its obligations under New Jersey law. As explained by the Receiver, the Debtor continues to violate New Jersey law by failing to maintain a segregated tenant security-deposit account as required by the New Jersey Rent Security Deposit Act. *Id.* ¶ 26. The Debtor has also failed to pay required tax payments to the City of Newark, *Id.* ¶ 29, and has failed to provide for an armed security guard to protect the tenants who reside at the Property as required by Newark law, Lagowitz Declaration ¶ 11.

15. The Debtor has also allowed its property management company (which is controlled by the Debtor's principal) to resign, placing both the Property and its Tenants at significant risk. On September 30, 2026, at approximately 8:52 p.m., Domenick Tonacchio, on behalf of Tona Management ("Tona"), sent a letter to the Receiver notifying him that Tona was resigning effective 11:59 p.m. that same evening. Lagowitz Declaration ¶ 9. Approximately 44 minutes later, at 9:36 p.m., Tona notified tenants that it would no longer serve as property manager. *Id*. Tona also took the following actions, each of which jeopardized the safety and security of the Property and its residents: (i) terminated all building employees, including concierge and maintenance personnel, *Id.* ¶ 10; (ii) terminated its contract with Hawkeye Security, the provider of armed guard services required by the City of Newark, *Id.* ¶ 11; and (iii) terminated its contract

for fire and life safety services, *Id*. As a result, at least one tenant reported being locked out of his apartment due to the absence of concierge services and expressed concern that the Property was left unprotected. *Id.* ¶ 12. Tona also revoked the Property's access to AppFolio, the property management software, and changed the associated usernames and passwords. *Id.* ¶ 13. Since receiving Tona's resignation notice, the Receiver has been working diligently with Progressive to assume management of the Property, including efforts to rehire the concierge, restore Hawkeye Security services, and otherwise secure the Property. *Id.* ¶ 14.

## BASIS FOR RELIEF

### I. RELIEF FROM STAY IS WARRANTED UNDER SECTION 362(d)(3) OF THE BANKRUPTCY CODE.

16. This Court has already determined that the Debtor is a single asset real estate debtor within the meaning of 11 U.S.C. § 101(51B). July 13, 2026 Hr'g Tr. 23:19, 24:7–8; Sept. 17, 2026 Hr'g Tr. 30:5-6. And, as the Court recognized on the record, the Debtor only had "90 days to come up with a plan that's confirmable." July 13, 2026 Hr'g Tr. 24:7–8. Specifically, that means that the Debtor was required to file a confirmable plan within ninety days of the Petition Date, by September 29, 2026, or, in the alternative, obtain an order extending its deadline under and in accordance with section 362(d)(3).

17. The plain language of the code is clear. Section 362(d)(3) of the Bankruptcy Code provides that the Court *shall* grant relief from the automatic stay with respect to a stay of an act against single asset real estate if a debtor fails to, within 90 days after the entry of the order for relief (a) "file[] a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time" or (b) commence monthly payments to each creditor whose claim is secured by

such real estate "in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate." 11 U.S.C. § 362(d)(3).[1]

18. As bankruptcy courts have recognized, "[t]he language of § 362(d)(3) is unambiguous. Congress was persuaded to give a secured creditor quick relief in a single asset case when the debtor fails to promptly file a plan or make early interest payments to the creditor secured by the real estate." *In re LDN Corp.*, 191 B.R. 320, 327 (Bankr. E.D. Va. 1996) (internal citations omitted). Stay relief under this section is "mandatory where its provisions are not strictly complied with." *Id.* This is because section 362(d)(3) provides that the Court "shall" grant stay relief, and as the Third Circuit has recognized, "[t]he word 'shall' is 'mandatory' and 'normally creates an obligation impervious to judicial discretion.'" *Scott v. Vantage Corp.*, 64 F.4th 462, 476 (3d Cir. 2023).

19. The Debtor did not heed the Court's admonition that it had 90 days from the Petition Date to file a plan, nor did it make any payments to BPT—which would be required to prevent the Court from granting stay relief under section 362. While it is true that section 362(d)(3) provides that the 90-day deadline may be extended by the Court, the Court may only do so if the Court enters an order "***<u>within the 90-day period</u>***." 11 U.S.C. § 362(d)(3) (emphasis added). Not only

---

1 Section 101(51B) defines "single asset real estate" as:

> [R]eal property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto.

11 U.S.C. § 101(51B); *see also In re Kara Homes, Inc.*, 363 B.R. 399, 404 (Bankr. D.N.J. 2007). It follows that a case may be designated as "single asset real estate" if: (1) the debtor's real property, which constitutes a single property of project; (2) the property in questions generates substantially all of the income of the debtor; and (3) the debtor is not involved in any substantial business other than the operation of the property in question and activities incidental thereto. *Kara Homes*, 363 B.R. at 404 (quoting *In re Philmont Dev. Co.*, 181 B.R. 220, 224) (Bankr. E.D. Pa. 1995)).

has no order been entered by this Court, but the Debtor made no attempt to extend its deadline. And although the Debtor has submitted a late-filed Proposed Plan, this is too little too late. The Court told the Debtor to file a plan within 90 days, but it did not do so. The Bankruptcy Code is clear. Stay relief is mandatory.

20. Moreover, even if the Bankruptcy Code did not mandate stay relief, the Proposed Plan is patently unconfirmable. First and foremost, it's unconfirmable because its feasibility is entirely contingent on a completely speculative refinancing that has no reasonable prospect of ever materializing. Proposed Plan, § 4.2. A proposed plan must present 'a realistic and workable framework" with a reasonable likelihood of succeeding on its own, without additional reorganization efforts by the debtor. *In re Am. Cap. Equip., LLC*, 688 F.3d 145 (3d Cir. 2012). "A court may not confirm a plan if its feasibility depends on future refinancing, unless there is an adequate evidentiary showing that such refinancing is likely to occur." *In re Linda Vista Cinemas, L.L.C.*, 442 B.R. 724, 738 (Bankr. D. Ariz. 2010).

21. The Debtor has been stringing BPT along for months, advising that a refinancing is imminent. None ever materialized, and nothing has changed. Tellingly, the Proposed Plan does not identify a lender – it does not attach a commitment letter, it does not reference a term sheet, and states no terms whatsoever: no interest rate, no maturity, no conditions to closing, no loan-to-value, and no indication that any lender has agreed, or would agree, to advance $69,000,000. Moreover, as the Court noted on the docket, no disclosure statement was filed that would inform the parties as to whether the Debtor has obtained refinancing.

22. The Proposed Plan is also patently unconfirmable because it violates the absolute priority rule. Class 4 general unsecured creditors are impaired and will recover only seventy-five percent of their Allowed Claims. Proposed Plan § 4.4. At the same time, the Plan delivers all of

the equity in the Debtor to an entity that BPT believes is owned or controlled by the Debtor's current beneficial owner. See Plan §§ 4.5, 6.12. Section 1129(b)(2)(B)(ii) of the Bankruptcy Code prohibits a junior interest holder from retaining property on account of its interest unless every senior unsecured claim is paid in full. However, the Proposed Plan purports to allow the Debtor's insiders to retain ownership of the reorganized entity while failing to pay unsecured claims in full.

23. As the Supreme Court held in *Bank of America National Trust & Savings Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434 (1999), under the Bankruptcy Code, existing equity holders may not retain an interest in a reorganized debtor unless the opportunity to contribute new value is exposed to the market. However, the Proposed Plan forecloses that process entirely and awards the reorganized equity to the Debtor's insiders on an exclusive basis, with no market test and no opportunity for any competing proposal.[2]

24. Accordingly, in light of the Debtor's failure to timely file a confirmable plan or make payments to BPT, or to seek an extension of the time in which to do so, relief from stay is warranted under section 362(d)(3) of the Bankruptcy Code.

## II. IN THE ALTERNATIVE, RELIEF FROM STAY IS ALSO WARRANTED UNDER SECTION 362(d)(1) OF THE BANKRUPTCY CODE.

25. In the alternative, even if relief from stay were not mandated by section 362(d)(3), there is ample cause for stay relief. Section 362(d)(1) of the Bankruptcy Code provides that a bankruptcy court shall grant stay relief "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1). The term "cause" is not

---

[2] The late-filed Proposed Plan has other deficiencies that render it unconfirmable. BPT has only identified certain of those deficiencies to highlight to the Court that had the Debtor timely filed the Proposed Plan, which of course it did not, it still failed to meet the mandates of section 362(d)(3) because it does not have "a reasonable possibility of being confirmed within a reasonable time."

defined in the Bankruptcy Code, but courts have recognized that it is "a broad and flexible concept," evaluated on a case-by-case basis. *Zagata Fabricators, Inc. v. Superior Air Prods.*, 893 F.2d 624 (3d Cir. 1990); *see also In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997).

26. BPT's security interest in the Property is not adequately protected. The Debtor has been in default since at least November of 2025, and to this date has not made any payments to BPT. "A debtor's failure to make required post-petition payments—whether mortgage payments or rent—can constitute 'cause' to lift the stay and is one of the best examples of a lack of adequate protection under section 362(d)(1)." *In re McKenzie*, 678 B.R. 20, 32 (Bankr. S.D.N.Y. 2026) (internal quotation marks omitted). "A continued failure to make monthly payments under loan documents can constitute cause for granting relief from the automatic stay." *In re James River Assocs.*, 148 B.R. 790, 797 (E.D. Va. 1992) (holding that stay relief is proper when a secured lender is not receiving payments and there is a minimal equity cushion); *see also In re McCullough*, 495 B.R. 692, 696 (W.D.N.C. 2013) (recognizing that "courts have consistently found that a debtor-creditor relationship with a history of non-payments is sufficient to show a lack of adequate protection").

27. The Debtor's failure to protect the Property constitutes further cause for stay relief. "A secured creditor is entitled to adequate protection as condition to continuation of the automatic stay to compensate or protect the creditor from a decrease or threatened decrease in the value of the estate's interest in property that is the creditor's collateral as a result of the automatic stay," such as where there is a "lack of insurance, failure to maintain the collateral, failure to permit periodic inspections, or a failure to report information affecting the collateral." *In re Young*, No. 7-11-12554 JS, 2011 WL 3799245, at *7 (Bankr. D.N.M. Aug. 29, 2011). Here, the Debtor has failed to pay insurance premiums, has failed to pay taxes to the City of Newark, has prevented the

Receiver from effectively accessing and maintaining the Property, and has even abruptly ceased managing the Property itself (without giving sufficient notice to the Receiver to enable him to obtain a substitute property manager). Collectively, these inactions jeopardize the collateral securing the Debtor's obligation to BPT. Because BPT's interest is not adequately protected, relief from stay is warranted under section 362(d)(1) of the Bankruptcy Code.

28. Tona's abrupt and unilateral decision to cease managing the Property with only approximately three hours' notice independently constitutes "cause" warranting relief from the automatic stay under section 362(d)(1). On September 30, 2026, Tona notified the Receiver at 8:52 p.m. that it was resigning effective 11:59 p.m. that same evening—a resignation window so narrow that it was clearly meant to preclude any reasonable opportunity to secure replacement management, staffing, or essential services. This abandonment was not merely procedurally deficient; it was substantively harmful. By immediately terminating concierge and maintenance personnel, canceling armed security services required by the City of Newark, and revoking fire and life safety contracts, Tona left the Property vulnerable, unprotected, and in potential violation of municipal requirements. The resulting harm to BPT's collateral is self-evident: the Property was left without security, without management oversight, without building access controls, and without essential safety services for several hours. Thankfully, the Receiver was able to rehire concierge services and security services that same night and is working diligently with the incoming property manager Progressive to take over control of management of the Property. Courts have recognized that a debtor's failure to maintain and protect collateral constitutes cause for stay relief. *See, e.g.*, *In re Young*, No. 7-11-12554 JS, 2011 WL 3799245, at *7 (Bankr. D.N.M. Aug. 29, 2011) (finding cause where there is "lack of insurance, failure to maintain the collateral, failure to permit periodic inspections, or a failure to report information affecting the collateral"). The circumstances here are

even more egregious: Tona's abandonment was not a passive failure to maintain, but an active and immediate withdrawal of all property management functions, executed with reckless disregard for the consequences to the Property, its tenants, and BPT's secured interest. Such conduct plainly constitutes cause for relief from the automatic stay.

### III. WAIVER OF THE 14-DAY STAY IS APPROPRIATE.

29. Bankruptcy Rule 4001(a)(4) provides that "[u]nless the court orders otherwise, an order granting a motion for relief from the automatic stay under [Bankruptcy Rule 4001(a)](1) is stayed for 14 days after it is entered."

30. Cause exists to waive the 14-day stay because the Debtor has failed to timely file a confirmable plan or make payments as required by section 362(d)(3), remains in longstanding default and has not made any payments to BPT for nearly a year, has frustrated the Receiver's administration of the Property, has failed to pay insurance premiums and taxes, and continues to jeopardize BPT's collateral, such that any further delay would unnecessarily prejudice BPT's rights and remedies.

## CONCLUSION

**WHEREFORE**, for the reasons set forth herein, BPT 50S Funding LLC respectfully requests that the Court (i) grant the relief requested in the Motion and enter the Proposed Order, and (ii) grant such other and further relief that the Court deems just and proper.

[*Remainder of page intentionally left blank*]

Dated: October 2, 2026

/s/ *Michael D. Sirota*
**COLE SCHOTZ P.C.**
Michael D. Sirota
David M. Bass
Andreas D. Milliaressis
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email: msirota@coleschotz.com
dbass@coleschotz.com
amilliaressis@coleschotz.com

*Counsel to BPT 50S Funding LLC*

# **EXHIBIT A**

**Lagowitz Declaration**

**COLE SCHOTZ P.C.**
Michael D. Sirota
David M. Bass
Andreas D. Milliaressis
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
dbass@coleschotz.com
amilliaressis@coleschotz.com

*Counsel to BPT 50S Funding LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>50 SUSSEX REDEVELOPMENT URBAN RENEWAL LLC<br><br>Debtor. | Chapter 11<br><br>Case No. 26-17635 (MBK) |

**DECLARATION OF IAN V. LAGOWITZ IN SUPPORT OF MOTION OF BPT 50S FUNDING LLC FOR ENTRY OF AN ORDER (I) GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§ 362(D)(1) AND (D)(3) AND (II) GRANTING RELATED RELIEF**

1. I, Ian V. Lagowitz, make this Declaration pursuant to 28 U.S.C. § 1746. I am a principal of Trigild LLC, which has an office located at 24 Church Street, Montclair, New Jersey 07042, and the Court-appointed receiver (the "Receiver") of the Property in this chapter 11 case. I have personal knowledge of the facts stated in this Declaration and, if called to testify, could and would competently do so. The facts set forth herein are based on my personal knowledge; my review of the books, records, and bank statements produced by the Debtor and its property manager; my communications with the Debtor, its counsel, and its management; and my review of the dockets in this Chapter 11 Case and the Foreclosure Action.

2. I submit this Declaration in support of the *Motion of BPT 50S Funding LLC for Entry of an Order (I) Granting Relief From the Automatic Stay Pursuant to 11 U.S.C. §§ 362(d)(1) and (d)(3) and (II) Granting Related Relief* (the "Motion")[1] seeking entry of an order, pursuant to sections 362(d)(1) and (d)(3) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 4001-1 and 9013-1 of the Local Rules for the United States Bankruptcy Court for the District of New Jersey (the "Local Rules") granting BPT 50S Funding LLC ("BPT") (i) relief from the automatic stay and (ii) related relief.

3. On July 23, 2026, this Court entered the *Order Denying Motion of Debtor and Debtor-in-Possession for Authority to Use Cash Collateral and Granting Limited Relief from the Automatic Stay* [Docket No. 45] (the "Receivership Order"), pursuant to which I was appointed as Receiver over the Mortgaged Property and the funds it generates.

4. Under the Receivership Order, I, acting as a fiduciary of the Court, am authorized and empowered to manage, oversee, and operate the Property and to take all actions necessary and appropriate to carry out my powers and duties [Docket No. 45, ¶ 3], including demanding, collecting, and receiving all rents, maintenance fees, and other charges relating to the Property, *id.* ¶ 3(b), and exercising sole authority over the Debtor's bank accounts for all Revenue (as defined in the Receivership Order) possessed by the Debtor or collected thereafter, *id.* ¶ 3(c).

5. The Receivership Order also requires the Debtor to cooperate with me by delivering to me the Property and the records pertaining to its operation, *id.* ¶ 4, and to turn over all cash and cash equivalents held as of entry of the Receivership Order that arose from operation of the Property, *id.* ¶ 5.

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

6. Additionally, the Receivership Order enjoins the Debtor and its principals, affiliates, agents, and representatives from collecting, accepting, encumbering, or otherwise transferring any deposits, rents, payments, fees, income, or profits arising from or relating to the Property; directs that any such funds received after entry of the Receivership Order be turned over to me immediately, *id.* ¶ 10; and enjoins all persons and entities from interfering with my discharge of my duties, *id.* ¶ 16.

7. However, the Debtor has failed to comply with its obligations under the Receivership Order and has ignored my demands for compliance. Accordingly, on October 2, 2026, I filed a motion to enforce the Receivership Order. In support of that motion, I submitted the *Declaration of Ian V. Lagowitz in Support of Motion for (I) Secondary Appointments for the Receiver and (II) Enforcement of the Receivership Order, Including Compelling Turnover and Accounting and Related Relief*, which is incorporated herein by reference.

8. Since then, the Debtor has continued to breach its obligations under the Receivership order by allowing Tona Management ("Tona"), an affiliate of the Debtor which provided property management services to the Debtor, to resign without proper notice.

9. Specifically, on September 30, 2026, at approximately 8:52 p.m., Domenick Tonacchio, on behalf of Tona, sent me a letter stating that Tona was resigning as property manager effective 11:59 p.m. that same day. A copy of this letter is attached hereto as **Exhibit 1**. At approximately 9:36 p.m., Tona notified tenants that it would no longer serve as property manager for the Property. A copy of this correspondence is attached hereto as **Exhibit 2**.

10. I was informed that Tona had terminated all building employees, including concierge and maintenance personnel.

11. Tona further informed me that it had terminated its contract with Hawkeye Security, the provider of security services at the Property, as well as its contract for fire and life safety services. A copy of the termination letter is attached hereto as **Exhibit 3**. This is a violation of the Debtor's obligations under Newark Law, which requires the Debtor to maintain an armed security guard to protect the tenants who reside at the Property. Newark, N.J., Rev. Gen. Ordinances § 18:5-1.1 (2026).

12. Following Tona's resignation, at least one tenant reported being locked out of his apartment due to the absence of concierge services.

13. Tona also revoked access to the AppFolio property management software and changed the associated usernames and passwords.

14. Following Tona's resignation notice, I have been working with Progressive to transition management of the Property, including efforts to rehire concierge personnel and restore security services that same night, and working with Progressive, the incoming property management company, to take over operational control of the Property.

15. I believe that the actions of the Debtor as set forth in the preceding paragraphs have jeopardized the Property.

16. I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

[*Remainder of page intentionally left blank.*]

Dated: October 2, 2026

**IAN V. LAGOWITZ**
Trigild LLC
24 Church Street
Montclair, New Jersey 07042
*Court-appointed Receiver*

# EXHIBIT 1

**Tona Resignation Letter**

**TONA PROPERTY MANAGEMENT LLC**
54 Hudson Street, Suite 300
Freehold, New Jersey 07728

September 30, 2026

VIA EMAIL

Ian V. Lagowitz
Lawrence Smoler
Trigild LLC

**Re: 50 Sussex Redevelopment Urban Renewal LLC / 50-54 Sussex Avenue, Newark, New Jersey; Formal Notice of Resignation Effective September 30, 2026 at 11:59 p.m.**

Ian and Lawrence:

This letter serves as formal notice that Tona Property Management LLC ("Tona") resigns as property manager for 50-54 Sussex Avenue, Newark, New Jersey, effective at 11:59 p.m. on September 30, 2026.

Tona has reached this decision after sustained efforts to work within the receivership structure following Trigild's assumption of control. Tona has repeatedly sought timely direction and approvals concerning payroll, tenants, vendors, supplies, disbursements, repairs, leasing, insurance, and other day-to-day matters. These requests required repeated follow-ups, received responses only after substantial delays, and consistently resulted in inconsistent and conflicting direction. This is not the behavior of a competent and responsible receiver, and it has made serving as your property manager completely untenable.

Your general failure to perform the basic duties of a receiver were then compounded by your repeated misrepresentations and lies, which have resulted in fractured trust that cannot be repaired. For evidence, look to your September 25, 2026 Motion to the Bankruptcy Court, wherein you affirmatively misrepresented that Tona paid itself the September 4 management fee "without [the Receiver's] approval." On September 4, 2026, at 3:57 p.m., Lawrence Smoler emailed us "Approved to pay payroll and management fee using funds in DIP account." Ian Lagowitz was a direct recipient of that email, along with Tona representatives and bankruptcy counsel. Your misrepresentations are easily refuted by the contemporaneous written record, yet you persisted in misinforming the court in a malicious and defamatory manner. Consequently, we are forced to spend critical hours responding to your spurious allegations instead of focusing on more important matters. This is an unacceptable distraction, and your failure to make truthful reports to the court speaks to character. The legal consequences of your actions will be addressed through counsel, but on a professional level you are not reliable or trustworthy, and consequently we are unable to do continue to do business with you.

For the avoidance of doubt, Tona's resignation is not an admission of any allegation contained in the Receiver's Motion, is not an acknowledgment that Tona failed to comply with any order or directive, and shall not be construed as agreement with Trigild's characterization of Tona's conduct whatsoever. Tona expressly reserves all rights with respect to the Receiver's conduct, the factual representations made in the Motion, amounts due or owing to Tona, and all other matters relating to the receivership and Tona's management of the Property.

Please identify immediately the person or entity who will assume operational responsibility as of 12:00 a.m. on October 1, 2026, together with designated contacts for tenant emergencies, payroll, vendors, utilities, life-safety systems, leasing, and other Property matters.

We expect Trigild to ensure there is no interruption in essential building operations, tenant services, payroll, vendor relationships, insurance, utilities, security, or safety functions following Tona's departure.

Sincerely,

TONA PROPERTY MANAGEMENT LLC

By: ______________________________
Name: Domenick Tonacchio
Title: Authorized Signatory

cc: Ian V. Lagowitz;

Lawrence Smoler;

Albert A. Ciardi III, Esq.

# Exhibit 2

## Email to Tenants

**From:** [redacted]
**Sent:** Wednesday, September 30, 2026 9:46 PM
**To:** Lawrence Smoler
**Subject:** Fwd: Hoyt Tower: Important Notice – Change in Property Management at 50 Sussex

CAUTION:**This message is from an EXTERNAL SENDER**.

Hey Lawrence,

I was just on the phone with you for apartment [redacted] Looking forward to hearing back from you soon !

Thanks !

Begin forwarded message:

> **From:** Danielle Tonacchio <donotreply@appfolio.com>
> **Date:** September 30, 2026 at 9:36:14 PM EDT
> **To:** [redacted]
> **Subject: Hoyt Tower: Important Notice – Change in Property Management at 50 Sussex**
>
> Dear Residents,
>
> Please be advised that Tona Property Management LLC will no longer serve as property manager for 50-54 Sussex Avenue effective September 30, 2026.
> Beginning October 1, 2026, Tona will no longer have authority or responsibility for the day-to-day management or operation of the building. Accordingly, all questions, maintenance requests, building concerns, emergencies, leasing matters, payment questions, and other property-related communications should be directed to the following contacts at Trigild LLC:
>
> Ian Lagowitz
> Trigild LLC
> Email: ian.lagowitz@trigild.com
> Phone: 973-303-7902
>
> Lawrence Smoler
> Vice President, Trigild LLC
> Email: Lawrence.Smoler@trigild.com
> Phone: 917-716-3644
>
> Please direct all property-management matters arising after September 30 to Mr. Lagowitz and Mr. Smoler, or to the new property manager/contact information they may provide to you.

Tona appreciates the opportunity to have served the residents of 50 Sussex and thanks you for your cooperation during our time managing the building.

We wish all of our residents the very best.

Sincerely,
Tona Property Management LLC
54 Hudson Street, Suite 300
Freehold, NJ 07728

# EXHIBIT 3

## Hawkeye Security Termination Letter

**TONA PROPERTY MANAGEMENT LLC**
54 Hudson Street, Suite 300
Freehold, New Jersey 07728

September 29, 2026

**VIA EMAIL AND FIRST-CLASS MAIL**

Hawk Eye Security LLC
10 Cutter Drive
East Hanover, New Jersey 07936

**Re: 50-54 Sussex Avenue, Newark, New Jersey – Notice Regarding Termination**

To Whom It May Concern:

Please be advised that Tona Property Management LLC ("Tona") is resigning as property manager for the property located at 50-54 Sussex Avenue, Newark, New Jersey, effective at 11:59 p.m. on September 30, 2026.

As a result, effective at 11:59 p.m. on September 30, 2026, Tona will no longer have authority to retain, direct, schedule, approve, or incur charges for security services at the Property. Accordingly, to the extent Tona is the contracting or ordering party for Hawk Eye Security LLC's services at the Property, this letter constitutes notice that Tona is terminating those services effective at that time.

This termination is not for cause and is not based upon any dissatisfaction with Hawk Eye Security LLC or its personnel. It results solely from Tona's resignation as property manager and the resulting transfer of operational control of the Property.

Please do not perform services, schedule personnel, or incur additional charges on behalf of Tona at the Property after 11:59 p.m. on September 30, 2026, unless separately authorized in writing by the Receiver, Trigild LLC, the successor property manager, or another party with authority over the Property. Any continuation of security services after that time must be arranged directly with the party assuming operational responsibility.

Thank you for your service to the Property.

Very truly yours,

TONA PROPERTY MANAGEMENT LLC

By: ______________________________
Name: Joseph Dougherty
Title: General Counsel

# **EXHIBIT B**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**COLE SCHOTZ P.C.**
Michael D. Sirota
David M. Bass
Andreas D. Milliaressis
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
dbass@coleschotz.com
amilliaressis@coleschotz.com

*Counsel to BPT 50S Funding LLC*

In re:

50 SUSSEX REDEVELOPMENT URBAN RENEWAL LLC,

Debtor.

Chapter 11

Case No. 26-17635 (MBK)

**ORDER GRANTING RELIEF FROM AUTOMATIC STAY**

The relief set forth on the following pages, numbered two (2) through three (3), is hereby **ORDERED.**

Upon the motion (the "Motion")[1] of BPT 50S Funding LLC ("BPT") for entry of an order (this "Order"), pursuant to sections 362(d)(1) and (d)(3) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 4001-1 and 9013-1 of the Local Rules for the United States Bankruptcy Court for the District of New Jersey (the "Local Rules") granting BPT relief from the automatic stay, as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.), and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157; and the Court having found that venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice having been adequately and appropriately provided under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed and considered the Motion; and the Court having held a hearing, if necessary, to consider the relief requested in the Motion; and the Court having determined that the legal and factual bases set forth in the Motion and at the hearing (if any) establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1. The Motion is granted as set forth herein.

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

2. The automatic stay is hereby vacated to enable BPT to enforce all of its rights and remedies of any nature, including but not limited to continuing the action captioned *BPT 50S Funding LLC, as Administrative Agent v. 50 Sussex Redevelopment Urban Renewal LLC, Domenick Tonacchio, 50 Sussex Manager, LLC, Tona Property Management LLC, and Tona Development Group LLC*, Docket No. SWC-F-003318-26, Superior Court of New Jersey, Chancery Division, Essex County, through and including a judgment of foreclosure and the resulting sheriff's sale of the Property.

3. Notwithstanding Bankruptcy Rule 4001, this Order is effective immediately upon its entry.

4. The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Order.

**EXHIBIT C**

**Transcript of July 13, 2026 Hearing**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 26-17635-MBK |
| | . | |
| | . | |
| 50 SUSSEX REDEVELOPMENT | . | |
| URBAN RENEWAL LLC, | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| Debtors. | . | |
| | . | July 13, 2026 |
| . . . . . . . . . . . . . . . | . | 1:00 p.m. |

TRANSCRIPT OF MOTION TO USE CASH COLLATERAL
BEFORE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Debtors: | Ciardi Ciardi & Astin<br>By: ALBERT ANTHONY CIARDI, III, ESQ.<br>NICOLE M. NIGRELLI, ESQ.<br>DANIEL S. SIEDMAN, ESQ.<br>1905 Spruce Street<br>Philadelphia, PA 19103 |
| For BPT 50S Funding LLC: | Stark & Stark,P.A.<br>By: TIMOTHY P. DUGGAN, ESQ.<br>Princeton Pike Corporate Center<br>993 Lenox Drive, CN 5315<br>Princeton, NJ 08543-5315 |
| | Glenn Agre Bergman & Fuentes<br>By: ANDREW K. GLENN, ESQ.<br>1185 Avenue of the Americas<br>22nd Floor<br>New York, NY 10036 |
| Audio Operator: | Linda Brakel |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609) 586-2311 Fax No. (609) 587-3599**

TELEPHONIC APPEARANCES (Continued):

| | |
|---|---|
| For Atlantic Specialty Insurance Company: | Chiesa Shahinian & Giantomasi PC<br>By: SCOTT A. ZUBER, ESQ.<br>105 Eisenhower Parkway<br>Roseland, NJ 07068 |
| For Bender Enterprises Inc.: | Norgaard O'Boyle & Hannon<br>By: JOHN O'BOYLE, ESQ.<br>184 Grand Ave<br>Englewood, NJ 07631 |
| For the U.S. Trustee: | Office of the United States Trustee<br>By: JEFFREY M. SPONDER, ESQ.<br>One Newark Center<br>Newark, NJ 07102 |

\- - -

(Proceedings commenced at 1:00 p.m.)

THE COURT: Okay, good afternoon, everyone. This is Judge Kaplan. Somebody give me a thumb's up, let me know you can hear me?

Great, that's always a good way to start. Let me adjust my screen. Bear with me. All right.

The Court is going to be hearing the 50 Sussex Redevelopment Urban Renewal, LLC matter, and the Court has had the benefit of reading the underlying motion papers, the papers that were filed over the weekend, and the papers that were filed this morning.

So, you've all kept me busy, but let me start with appearances. Let's start on behalf of the Debtor.

MR. CIARDI: Good afternoon, Your Honor, Albert Ciardi, Nicole Nigrelli, and Daniel Siedman, all for the Debtor, and also appearing to the extent testimony is necessary, Domenick Tonacchio and Yelena Saturn. They were our witnesses for today.

THE COURT: All right, thank you.

Other appearances?

MR. DUGGAN: Good afternoon, Your Honor, Timothy Duggan of Stark and Stark, on behalf of BPT 50S Funding, LLC, and I also have my co-counsel on the line with an application pending for admission pro hac vice, and we'd request that he be permitted to argue today.

THE COURT: Is that Mr. Glenn?

MR. GLENN: Yes, Your Honor.

THE COURT: Welcome to New Jersey.

MR. GLENN: Thank you, Judge.

THE COURT: Pro hac will go through the formalities, but certainly I'll hear you for today.

MR. GLENN: Thank you.

THE COURT: I see Mr. Sponder. Good afternoon, Mr. Sponder.

MR. SPONDER: Good afternoon, Your Honor. Jeff Sponder from the Office of the United States Trustee.

THE COURT: All right.

Other appearances?

MR. O’BOYLE: Good afternoon, Your Honor. John O'Boyle, Norgaard O'Boyle and Hannon, on behalf of Bender Electric, Inc.

THE COURT: All right, thank you.

I don't see anyone else. Oh, Mr. Zuber, yes.

MR. ZUBER: Good afternoon, Your Honor. Scott Zuber, Chiesa Shahinian and Giantomasi. I represent Atlantic Specialty Insurance Company.

THE COURT: I'm sorry, could you repeat that? Who do you represent?

MR. ZUBER: I represent Atlantic Specialty Insurance Company.

THE COURT: Oh, okay.

MR. ZUBER: They're a large unsecured credit.

THE COURT: Great, thank you.

MR. ZUBER: Thank you.

THE COURT: Okay. Anyone else I don't see?

So, let me lay the framework as I understand it, and then I want to start off listening to Debtor's counsel.

What we have is this roughly 200-unit luxury apartment building in Newark. There was a $62.5 million bridge loan taken out in October of 2024; I think the two lenders are Israel Discount Bank and BPT.

The intent, I think all would agree, was for the Debtor to refinance the property within the year, and I think the game plan was to go work through HUD for that refinance. I understand at the time the initial loan was taken out, there may have been an appraisal in the roughly $85 million range. There's been subsequent appraisals that the Debtor has secured in the $100 million range.

The loan went into default in the fall of 2025 from October through November, and the issue for today, it's the Debtor's motion for use of cash collateral. We have a Jason Realty issue.

I understand that there were, as part of the foreclosure, there was an application to appoint a rent receiver, Mr. Lagowitz. There was at some point a consent,

although it was to take effect at a certain point, day and time, and the filing occurred maybe an hour before it was to take effect.

This is just broad. I expect you all will fill in the details, but just confirm my understanding. And I know the lenders take issue that there can be cash collateral based on Jason Realty, and the Debtor is taking the position that the revocable license that always accompanies the assignment of rents can only be bottomed on a default, and if there were a default it was caused by an affiliate of the lender and how they went about the allegation interfering with the refinance efforts.

So, that's my broad understanding. Let me turn to Mr. Ciardi. I think for today's purposes really the hurdle to tackle is the assignment of rents issue. So --

MR. CIARDI: Understood, Your Honor. And in that regard, that's why we focused in our supplemental brief on why, again, our argument is not that Jason Realty does not apply. It's that Jason Realty fills in one piece of the puzzle.

According to the Jason Realty decision, the Court is to look at New Jersey law and what does New Jersey law require in this situation. So, Jason Realty in and of itself is not a club or a shield which this lender gets to use as it needs to. It is a dictate to the Court that the Court should apply the New Jersey law, and Jason Realty was obviously applying it in a

way that was harmful to the Debtor but never addressed what New Jersey law says or does not say with regard to whether the lender's default predates or caused the alleged default of the borrower.

So, our brief focuses on that point because if we are correct, and that's why we filed also our adversary proceeding to put those facts straight at issue with the Court, if we are correct, and we believe we are, and the lender's default predated or caused our default, then under New Jersey law, as we put forth in the supplemental brief in Schwedd and Lettieri (phonetic), which I don't really cite a lot of 1920, 1930 cases, Your Honor, but in all fairness, so did the Jason Realty Court, and that's where they found their decisions in the Wolf decision dealing with assignment of rents in New Jersey Court.

So, looking at those two decisions, it is clear that New Jersey does take the position, whether it be by assignment or mortgage, and in this case, I would cite to Axon (phonetic), and I'm not repeating my whole brief, Your Honor.

THE COURT: Right.

MR. CIARDI: But I just want to bring it all together. If the lender has -- if the default doesn't exist in Axon, well, the mortgagor got to keep the rent. Well, the follow-on of that, if you then apply Lettieri and Schwedd, if the lender caused the default, then it should not be able to take advantage of its right to revoke the license. And based

upon this Court's decision in Whitaker, and then the Supreme Court's affirmance of that decision in Whitaker, property of the estate is as broad as it possibly can be, as long as it is a right under the state law.

Clearly, that revocable license, as tenuous as anybody may argue it may be, is a right. It is a property right of the debtor. It's a fundamental right, because without that right, we cannot reorganize. I will not make that argument to the Court that without the rents, we can survive. We need the rents.

THE COURT: Well, let me stop you on that, because that actually takes me by surprise. I would think, however I were to rule today on the use of rents, that doesn't necessarily mean you could not look to refinance while the rents are being collected or sell the property. It doesn't mean --

MR. CIARDI: Absolutely, Your Honor. To the extent we went the traditional route with a bootstrap plan and to try to reset the debt, without the rents, we can't do that.

Yes, we have had refinancing discussions. I think they're talked about in the pleadings, and we are still pressing that and may continue to press that in conjunction with our litigation.

If Your Honor were to deny use of the rents today, we would still pursue our litigation, take our discovery, attempt

to get another lender in place. Unfortunately, we would not be able to go the HUD route because they won't work with a lender in Chapter 11.

But the route that we had before will still be open to us depending on what Your Honor may ultimately rule is the lender's claim based upon what we believe the damages may or may not be and that will give us the opportunity to pay the unsecured creditors, two of whom are participating on the call today.

So, sorry for that little detour. I didn't mean to be entirely negative on our prospects. I wanted to be clear at least with regards to rents where we are.

So, with the fact that New Jersey law which this Court needs to look to under Jason Realty, allows or says that the lender doesn't get to do these things if it is in itself in default or has caused the default and I think the Lettieri decision, and Schwedd decision make it very clear; if they are the cause, they don't get to benefit from it.

So, looking at those facts here, as Your Honor noted, the bridge loan came in in October of '24; so, did the finance agreement or the broker agreement with Bravo Capital. It was clearly an affiliate owned by the same person, Mr. Krowitz (phonetic at *1:11:44). And they took the process and they were exclusive and that is important, Your Honor, for this discussion because my clients reasonably relied upon Bravo

filing that application with HUD.

We are not alleging here that the default of the lender is the failure to obtain the loan. Like, we can't, nobody can guarantee what HUD will or will not do. However, when they executed the engagement letter, which is attached to the complaint, they had an obligation to see that process through and file that application so that we had the time, because it is a lead time, and we have alleged in our complaint that we had done everything we were required to do.

And then, the process stops. And it stops, not because of what we do, but because of what Bravo does. Bravo, the same person, the same guy that's running Bravo is the same person running the lender.

So, Bravo has a duty to us to go get the loan and act in good faith and represent our interests; that's Mr. Krowitz. And at the same time, Mr. Krowitz is the lender seeing a property come in with a $100 million in appraisal, with a $65 million loan, now a $35 million spread.

This is a loan-to-own scheme, Your Honor, that's how the Debtor sees it. And taking all that back now to cash collateral because again, I don't want to repeat everything in all the pleadings, but taking that all back, when you look at the New Jersey law, the New Jersey law would say in this situation, shouldn't deny use of cash collateral. You shouldn't let that revocable license be revoked; you shouldn't

find that it was revoked without there being a hearing or a trial on the underlying facts of that complaint because without that you're allowing the lender, and I don't mean this you in any pejorative way, Your Honor, but the Court would be allowing the lender to use the Jason Realty decision as a get out of jail free card; can do all the damage it wants pre-filing, and once the filing comes, holds up the Jason Realty card and says, no, Court, you can't do anything regardless of what I did here; you can't preserve the status quo, which is what we do in Bankruptcy, we preserve the status quo while that issue is addressed because addressing that issue protects my client's $15 million equity investment and the several million dollars of unsecured creditors that remain in the property.

And looking at what a plan could be and why that dovetails into it, I have a tax claim which can be impaired, I have equity in the property, which means I have unsecured creditors, which can be paid in full over time.

So, this is a situation, Your Honor, unlike typical single asset real estate cases, where the Debtor does have the ability to reorganize, pay the lender whatever they are due after Your Honor would rule on the complaint and try that and hear all the facts.

It's not a complicated complaint. This is not something that can't be addressed in short order. I'm not suggesting that the Court has the time or the schedule to hear

things on a super-expedited basis, but it's a breach of contract and on a very discreet time frame, there's no reason why a trial on the complaint couldn't be held in September or October while the Court maintains the status quo with use of cash collateral.

That is how the Debtor perceives this case proceeding and in the interim, the motions to dismiss and or for relief could carry. The Debtor would file its plan and the Court could hear everything at once with all the witnesses live in a proceeding where the testimony could be taken because this does seem to be a situation where credibility would be an issue.

So, for all those reasons, and again, this is only addressing the Jason Realty issue, Your Honor, not the traditional, is our budget appropriate, are we paying the right things, which I can't imagine if the Court were to permit use of cash collateral, that Mr. Duggan, Mr. Glenn and I couldn't agree on what should be in the budget. But that's assuming, Your Honor, we're to get there.

But we do believe that this case doesn't fall under the, I should say, falls under Jason Realty, but it falls because of New Jersey's law, which the Court's bound to apply pursuant to Jason Realty, is accepted from the restriction on use of cash collateral because the license has not been revoked.

THE COURT: All right, before I turn to Mr. Glenn,

let me ask you about what went on in the state Court because it seems from what I was able to glean from the pleadings, the state Court was prepared to appoint a rent receiver and actually there was an order that was going to go into effect.

Were these issues raised before the state court? I mean, the Debtor, it seemed, was going to consent to the appointment of a receiver, so it's hard to understand how it wasn't a default when you have the state Court ready to appoint a rent receiver.

MR. CIARDI: So, Your Honor, there was no factual hearing with regard to these default issues in the state Court. The Court -- I tried the case in the state Court and Mr. Duggan was there as well, so where -- what we had, we had what we believed was a refinance pending to close on June 10th with the parties being, we thought, close to what the lender coming in and the lender that would be going out where we thought where that gap would bridge.

So, to the Debtor, we had made it clear to the Court, we thought we needed 30 days and we would close before then. I think the Court heard, but did not rule on the issues that were brought up with regard to the default because at that point in time, we had not yet been able to file the answer and counterclaim because also under New Jersey state law, some of these issues would not be germane to counterclaim in the state Court, would be brought in a separate proceeding that we would

have.

So, I'm not going to say that the state Court was happy with the factual presentation with where we were on certifications with regard to the defaults but did not use lack or no lack of evidence there. That wasn't the grounds for the decision. I think the decision was attached to the certification of Mr. Glenn's partner and that's in there.

The decision was based primarily on, as I read it, us saying we only needed about 30 days and the Court feeling that there would be, that there really wasn't, they didn't feel there was equity in the property. So, that's how I read the decision, Your Honor.

THE COURT: It just seems --

MR. CIARDI: Again, I’m reading it favorably to my side.

THE COURT: Fair enough. It seems though implicit that a Court contemplating the appointment of a receiver in a foreclosure action, that there would have been a default to start the process.

MR. CIARDI: But there's no doubt a default was alleged, Your Honor.

THE COURT: Yeah.

MR. CIARDI: But what we're saying is that default, to the extent it even occurred, was caused in the proximate result of the lender. And if that's the case, yes, you could

have a default here, but if there is that preexisting default or misconduct, which is what we also see here and which we have alleged, by the lender, the lender should not and cannot, under Schwedd and Lettieri, take advantage of that, either under the assignment or the mortgage.

THE COURT: Now, the wrongdoing, the alleged wrongdoing, is Bravo, but you're pointing to the relationship between Bravo and BPT, correct?

MR. CIARDI: Same individual, Your Honor. Mr. Krowitz runs Bravo. Mr. Krowitz is the individual that signs everything for BPT, well aware that Israel Discount Bank is a partner in BPT, I understand that, but so is the entity that Mr. Krowitz controls, and he is the party that the Debtor deals with.

THE COURT: All right. Thank you, Mr. Ciardi.

Let me hear from Mr. Glenn or Mr. Duggan.

MR. GLENN: I'll handle it, Your Honor.

THE COURT: Sure.

MR. GLENN: Andrew Glenn, for the record, for BPT. Thank you very much.

I want to start out by saying that this is certainly not a loan-to-own situation. We're a lender. We want to be repaid, nothing more, nothing less, and I want to highlight the fact, by way of background, because Mr. Ciardi went into extensive background, that the first payment default in this

matter occurred in November of last year. And so, we're dealing with, I believe, eight missed monthly interest payments for this Debtor. That is uncontested.

And so, the notion that we, BPT, were trying to hostilely take over this property flies in the face of the facts, because we waited and waited and waited in the hopes that there could be a refinancing.

And what Mr. Ciardi is telling you is the same stuff we've heard for months and months and months, that a refinancing was coming, we should wait, we're going to get paid. It never came. It never came, except for amounts that required us to make concessions to the Debtor. And so, we did what we had to do after waiting and after being disappointed month after month.

Now, also by way of background, so the company has pocketed seven months of interest payments that would otherwise go to us. We have asked repeatedly for an accounting of those funds, and at least part of the state Court decision was as a direct result of the borrowers playing the shell game with our collateral.

And we still don't know, as we sit here today, where that money went. And therefore, the state Court held that our collateral was in imminent danger of deterioration and loss. And so, let's get to the meat of this, which is Jason Realty.

So, it's good to hear that there's no doubt, no

disagreement that Jason Realty applies, that our absolute assignment of rents qualifies under the Jason Realty case as having those rents be outside of the property of the estate.

What we have is a license that the Debtor had that was revoked automatically upon the failure to make that first interest payment, and repeatedly thereafter, with subsequent defaults, a written notice in April; there's absolutely nothing contravening the documents and evidence in the record indicating that they made a payment default, along with other covenant defaults. That's all in the record.

Now, we've heard Mr. Ciardi eloquently try to justify what his client has done. But what I would highlight for Your Honor in the record is that there's no declarations, no affidavits substantiating anything. Mr. Ciardi's comments on the record are not testimony.

An adversary complaint that's eight pages long, looks like it was very hastily put together; is very, very short on the facts, is not evidence, it's just allegations. And so, we started this by saying, by getting a motion from the Debtors that was just a very dry cash collateral motion. We have the right to use cash collateral. There was no suggestion or explanation of the assignment of rents in that.

And now, we are before the Court on a convoluted basis that does not give the Court significant time to consider these because we had to bring these up for the first time in

our opposition on Saturday, and we're now hearing about the arguments now.

But if you look at the complaint, Your Honor, the complaint seeks one thing and one thing only, which is money damages, $100 million. As I think Your Honor indicated, and Mr. Ciardi also reflected, they are free to bring that complaint wherever they want. If they have a $100 million lawsuit, they could have brought it in November when they claim this loan should have been refinanced.

They obviously don't believe in their case because there is no case. But at the end of the day, you are here, we are here, on a question under Section 541 of the Bankruptcy Code, which is who owns those rents? And the answer is, us and us only.

What they've done is they've made very, very weak allegations concerning Mr. Krowitz and his participation in the HUD refinance process. And I would note, for the record, that there have been many, many other refinancings outside of HUDs that have been promised to us. But there is nothing with respect to any evidentiary foundation that would show that ownership of the rents did not start with us and did not end with us after this undisputed payment default in this case.

So, what Mr. Ciardi is telling the Court is that all you need to do to avoid the ramifications of Jason Realty is to come up with allegations and a complaint that really don't go

to the issue of ownership. And therefore, you get to use cash collateral. And presumably, they want to use our cash collateral to fund the fight against us, which obviously is something they can't do.

So, I don't think they've raised a triable issue of fact as to how the license was not properly terminated. They don't dispute that the interest was not paid. They don't dispute that that automatically terminated the license. They're saying that somehow, someway, there should have been a refinance at some point, and we wouldn't be in this situation.

But what they don't show, Your Honor, in the complaint is the contractual pathway that would lead Your Honor to come to that conclusion.

So, at the end of the day, I think there is no ownership interest in the rents. The license was properly terminated, and nothing they've raised changes anything with respect to the ownership of that revenue stream. They are free to bring that complaint, not using our cash collateral. They are free, and we encourage them to find a refinance so we will go away and take what we are owed, or they can sell the property, and we can get what we're owed.

But I think that was the purpose of the receivership application that we made, and that is the best venue for that to occur. So, unless Your Honor has any question, I would stand on that argument and our papers.

THE COURT: All right, thank you.

Let me turn to other counsel. Mr. O'Boyle, do you wish to be heard?

MR. O'BOYLE: Only to say that we support the creditor's request for a dismissal of the case. Like the secured creditor here, a vendor has been promised for a long time that they would be paid through a refinance of this property, and the refinance has not come. So -- and that's all we have.

THE COURT: All right, thank you, Mr. O'Boyle.

Mr. Zuber?

MR. ZUBER: Thank you, Your Honor. We're not going to take a position at this moment. We'll just abide by the Court's decision on the use of cash collateral.

THE COURT: All right, thank you.

Mr. Sponder, does the U.S. Trustee want to weigh in?

MR. SPONDER: Thank you, Your Honor. Jeff Sponder, again, from the Office of the United States Trustee.

Your Honor, the United State's Trustee has not taken a position as to Jason Realty. If Your Honor does approve the cash collateral request, I understand that the Debtor has and will incorporate comments raised by the United States Trustee pursuant to that order. Thank you, Your Honor.

THE COURT: All right, thank you.

But let me go back. Mr. Ciardi, is there anything

you wanted to add in response to Mr. Glenn's argument?

MR. CIARDI: Very, very brief, Your Honor. A couple things. The HUD application, the failure to file that occurred in October of 2025. That's alleged in the pleading. That is before the interest reserve ran out.

We filed a complete accounting. It's attached as Exhibit E to the certification. So, all of the money that would have been collected is attached and included in Mr. Tonacchio's certification in Exhibit E. His certification at Exhibit -- also includes the prior certifications, which reference the factual basis of the interference and breach of contract by the lender.

So, they are incorporated and included in his certification in this Court. So, there is a factual record which Mr. Tonacchio has certified to. That's in paragraph 23 of the certification. The reason why anything wasn't filed up until this case, Your Honor, up until June 30th, we had every hope that this -- we would not be in Bankruptcy Court, that there would have been a payoff in a refinance.

I want to be clear, what we didn't hear is anything that would counter the allegations of the Debtor with regard to the failure to file the HUD application, and also the budget that we have attached to the motion for use of cash collateral does not include legal fees to challenge the bank. That is something that the Debtor is aware would need to be funded

separately.

So, just to address those points from Mr. Glenn now. Thank you.

THE COURT: All right, thank you.

This Court has had to tackle Jason Realty in a number of cases. And I think I've always been pretty clear in my lack of support for the rationale underlying Jason Realty. Let me just be as blunt as possible. I thought it was a terrible decision.

But yet it is, it's the law in the Third Circuit, and other than in unique situations such as with hotel rents, I know I have published opinions where I've applied it as the Third Circuit directs. I think in one of the cases is Surma (phonetic), a small commercial home situation.

The issues that have been raised this afternoon are not amenable to a summary disposition as far as potential wrongdoing by a lender or a lender's affiliate.

The allegations made certainly would go to raise concerns for the Court about the appropriateness of any default, the appropriateness of a default rate of interest, and certainly the potential for damages. But it must await a trial where the Court can afford the parties the opportunity to present the evidence through testimony or documentary or otherwise, certainly not in a disposition based on the certifications and the argument that have been raised to date.

What the Court has in front of it this afternoon is a situation where I don't think the Debtor can take issue that there has been payment defaults. I certainly understand the argument as to why that they laid the default at the feet of the lender, and I understand that argument.

But we have a Jason Realty situation. We have an absolute unconditional assignment of rents. We have a revocable license, and we have defaults going back. We have a state Court that was prepared to issue -- to appoint a receiver. We had the parties negotiating a consent order appointing a receiver.

It's hard for the Court to fathom that there couldn't have been a default. And I don't think the counsel is really argued there wasn't a default. It's just the cause of the default.

I see little harm in allowing the receiver to go forward and collect the rents in the short term. Let me be clear; I'm not dismissing this case, and I'm not granting stay relief. This is a single-asset real estate case, but that afford the Debtor, under the Code, has the ability to come up with a plan to sell or refinance or otherwise satisfy obligations.

I do not find bad faith simply in the filing of a Chapter 11 on the eve of foreclosure. If that were the case, it would knock out three quarters of a Chapter 13 calendar I

have. It just -- the changes made in single asset real estate cases reflected that Congress moved away from the two-party dispute arguments and the like to afford a Debtor the opportunity to reorganize a single asset real estate case, but with certain restrictions, and that would be a timing restriction.

The Debtor has the 90 days to come up with a plan that's confirmable. The Debtor doesn't need, from what I've reviewed, to use the cash in order to confirm a plan. It would probably be a lot easier, but there are ways of confirming a single asset real estate case, and it can include by means of litigation, which can continue.

Though certainly a feasible plan, I think American Capital Equipment says it can't be bottomed on hypothetical litigation, but you can confirm a case. So, this litigation will continue, the case will continue, but I'm not inclined to ignore what's in front of the Court, a Jason Realty situation, whether your rents are not property of the estate.

Because they're not property of the estate, the lender can move forward and collect them. I will require the lender to provide, just as I would have with a cash collateral order, a weekly accounting of rents collected and expenses paid, and how they're applied.

Now, it might be, and I'll ask counsel to consider, and also U.S. Trustee, the order appointing Mr. Ligowitz came,

I believe, maybe an hour after the filing, so technically it probably was a stay violation. I can grant limited stay relief to allow that order to go forward, maybe the easiest thing to do.

Since the rent receiver will collect what this Court has not yet determined to be property of the estate, whether or not the rents are property of the estate may change depending on how litigation proceeds, but as of now the Court is not convinced it is property of the estate.

So, I don't see a problem, and Mr. Sponder, I'll ask you to weigh in, I don't see a problem with the rent receiver collecting the rents during an ongoing Chapter 11. But let me hear from counsel on that issue.

MR. CIARDI: Your Honor, at least with regard to the Debtor, I think, I don't know if the receiver, and this is just a question, Your Honor, I'm not being critical of the opinion, but if the receiver is appointed by state Court, and that order is now void, not that we want him at all, but would it be better for there to be some form of appointment out of this Court because we are here, and therefore the direction and the accounting only flows to one master, you, and not to too many masters. That is only a thought, Your Honor, I'm not --

THE COURT: No, that's actually my concern, because the receiver reports to the state Court, but --

MR. CIARDI: The receiver should appoint to this

Court because it is this Court that will review and ultimately determine are those rents our property or their property?

THE COURT: Let me hear from counsel for the lender, what are your thoughts?

MR. GLENN: Your Honor, I don't think there's a problem with two masters because I think what's going to happen is what Your Honor directed, which is the receiver will collect the rents and report to this Court.

I think it should also report to the other Court, but we're stayed in that other action, so I don't think anything is going to happen in that other action. I just think it's unfair for the receiver appointed by that Court to be totally divorced from that proceeding.

But again, this sounds like form over substance. As long as our receiver is collecting the rent and there's transparency for everybody, I can't imagine it's going to be a problem either way. But obviously, our preference ultimately, if the company -- if this case is dismissed, can't confirm a plan, we're probably going to be back there anyway.

So, I think we need to think about who the receiver is reporting to, which is Your Honor, while there's an automatic stay. But I think I don't see any harm in whatever reporting obligations that are extant that those would also apply to the state Court. And Mr. Duggan can correct me if he has a different view about that.

THE COURT: Mr. Duggan, your thoughts?

MR. DUGGAN: Sure, Your Honor. My suggestion would be as to an all the stay effective July 1. So, the receiver, we don't have to go back to the Superior Court in New Jersey to get a new order.

And second, we can put a provision in the state Court order. So, generally, the state Court receivers do monthly reports. We could go back in and modify that to weekly reporting. That can be uploaded onto the Court, which I don't think would be a problem, with copies directly to Mr. Ciardi.

And there is provisions of the Code that do allow pre-petition fiduciaries to stay in place at the Court's discretion, usually in the form of a receiver.

THE COURT: Right.

MR. DUGGAN: The Code section isn't jump of the mind, but, you know --

THE COURT: 543D, probably.

MR. DUGGAN: Yeah, so 543D would be, okay. I could leave my receiver in place. So, I think there's a number of tools here. But my suggestion would be if we can hold the stay to July 1, so that we don't have to go back and get a new order, and there's no challenge to whether it's void or avoidable.

And then, we could just put in an amended receiver order to, one, confirm what happens to the excess proceeds,

which is they get held. And two, have weekly reporting.

THE COURT: All right. Thank you, Mr. Duggan.

Mr. Sponder, your thoughts?

MR. SPONDER: Thank you, Your Honor. Jeff Sponder, again, from the Office of the United States Trustee.

Your Honor, yes, 543, I think, is the section that applies. But with respect to that, 543B, when a Bankruptcy case is filed, requires turnover by the custodian. Your Honor, does have the authority under 543D to change that. It's typically the United States Trustee's position that there should not be a rent receiver involved. And if we're going to have some type of receiver or someone involved, then we would think Chapter 11 Trustee, as opposed to a rent receiver.

So, that's where we would come out on that, Your Honor. Thank you.

THE COURT: Thank you. My problem with the Chapter 11 Trustee is the obvious. It's the cost associated with that. I think it not only hurts the Debtor and the lender and the unsecured creditors.

It's not a complex case here and truly, this is not a situation where, at least on the record in front of me, I can point to any wrongdoing by the Debtor of management, other than not getting the loan refinanced. And certainly, there's issues to be explored as to the cause of that.

I'm not comfortable with the appointment of a Chapter

11 Trustee. What I'm going to do, I think, Mr. Duggan, it makes sense, is annul the automatic stay for a limited purpose, certainly not to continue the foreclosure efforts, but only to authorize and implement the appointment of the rent receiver, and I will require that the rent receiver escrow all surplus funds over and above the operating cost after collection of rents.

I will also require that the receiver file, I don't want to overdo costs, bi-weekly reports; keep it on a short lease, every two weeks. The Debtor is free to continue to and should move forward with efforts to refinance, propose a confirmable plan.

My suggestion to all of you, and it's not at a point where I'll direct it, but I'm close, this is a case that would scream out for a mediation to just to resolve a dispute between the parties, before you all spend the dollars on litigation and discovery, and a battle over confirmation of a plan, and everything that's involved in a contested Chapter 11, I would urge you to consider mediation.

I would be happy to appoint someone that the parties can agree on and keep it on a short lease. This case is on a short lease as it is, given that it has the appearances of a single asset real estate case.

As far as the cross motion for stay relief, I think I've made my views clear. I'm denying stay relief or dismissal

without prejudice. I don't think there's a purpose served in keeping them on the calendar. They're easy enough to put back on the calendar, depending upon the direction of the case and where it's going.

And again, I don't want to do anything on the docket that will impair a Debtor's ability to try to formulate a plan or secure refinancing. So, I don't think it helps to have stay relief motions as a dismiss pending.

I'll ask you to agree on a form of order annulling the stay for the limited purpose. Mr. Sponder, I appreciate the position of the U.S. Trustee. It doesn't surprise me. They've never wanted outside fiduciaries to come in. But this is not a case where I think I want to go that next step. I think it's a disservice to the creditors and to the Debtor in that regard.

The complaint needs to be served and answered. We can, at a pretrial, agree on an expedited discovery and an expedited scheduling. Again, before you all go down that path, please consider and I'll ask the counsel for both the lender and the Debtor to meet and confer and talk about a potential mediator. I'm not going to offer myself because I've gotten in trouble apparently because of that.

But you can find somebody else who, if need be, come back to me; the hell with them. But I think you'd be better served by getting somebody independent and give you the time,

and it's not costly. This would not be an extended mediation. But it does scream out for a resolution here by all accounts, even based on the lender's appraisal, I think there's an argument that there's meaningful equity here; and it should be preserved for unsecured creditors and the equity holders.

Anything else I can address?

MR. DUGGAN: Your Honor, one housekeeping issue --

THE COURT: Yes.

MR. DUGGAN: -- when it comes to the form of order. So, in the state Court, when the Judge granted our order to show cause and appointed the receiver, he required any excess funds after payment expenses to be escrowed.

And then, since the petition day through now, there's probably the January rents. So, we would just request that under the form of order, that money just be turned over to the receiver subject to the receiver holding it so we could have a transition from the state Court, the money they're holding, the January rents, just gets turned over to the receiver account so the receiver has basically the fresh start from January 1 forward because of the annulment.

And again, subject to all the requirements in the order, which is hold weekly accounting, balance sheets, and income and expense statements.

THE COURT: Mr. Ciardi?

MR. CIARDI: Just two points, Your Honor. Number

one, I believe Mr. Duggan's referring to July 1, not January.

THE COURT: Right.

MR. CIARDI: And the only other thing that I would suggest is there are, I think the receiver will have to hire individuals to do, right now, our clients, my clients are managing. The receiver has the right to put in his own management, his own supervisory staff, his own superintendents, whatever building maintenance people they're going to do.

Obviously, we have tenants that need to be cared for on a, cared for is not the right word, serviced on a daily basis. So, until we know what the receiver wants to do, it will be difficult for us to manage the building unless that receiver's got a plan in place to either use our people or has people ready to start right away.

I only raise that because I don't know if that was something that anybody knows because we just knew that they had wanted this company, Trigild, to be the receiver.

THE COURT: Mr. Glenn, it would seem to me, to make the most sense, your concern would be to have the rents collected and to be in control of the funds. I would think you would want to work with the Debtor as far as on management. You don't need to hurt the tenants that are in place and you need to get services that are appropriate undertaken and there is a time element. What are your thoughts?

MR. GLENN: Yeah, thank you, Your Honor. I was going

to suggest that you let Mr. Ciardi and us meet and confer. We don't want to waste time, we don't want to waste money. If there's a way to do this efficiently that's consistent with protecting some of our issues then you know that's what we need to do.

So, why don't you let us work this out without your intervention if we can and come back to you if we can't but I think this is one of those things we're just going to have to slice and dice this and come up with practical solutions and I'm not equipped to do that on the record now.

THE COURT: No, I think it does make sense for a meet and confer, Mr. Ciardi.

MR. CIARDI: I think that’ll be fine, Your Honor.

THE COURT: And the Court is here.

MR. CIARDI: We understand the rent issue that they want to own and collect and control the money.

THE COURT: Yeah.

MR. CIARDI: I'm more concerned with just servicing the people and making sure that all of our interests are preserved, that the property stays at what we think is a good value. That’s -- which I think --

THE COURT: Well, and that's the Court's concern as well which is why I would push you all to work together on this. If you need me, we'll have a conference call if you can't work out a form of order.

So, what I'm contemplating is a form of order annulling the stay for a limited purpose to implement the state Court order but you have to modify the state Court order or include it in the Bankruptcy Court order as far as additional obligations on the receiver.

All right. And if there's a need, just reach out for chambers, we'll have a quick call and if the parties can't agree you know I'll make the call. All right.

MR. CIARDI: Thank you.

MR. DUGGAN: Thank you, Your Honor.

THE COURT: Thank you, Counsel.

IN UNISON: Thank you.

* * * * *

**C E R T I F I C A T I O N**

I, TRACY E. VERGOLLO, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

/s/ Tracy E. Vergollo

TRACY E. VERGOLLO

J&J COURT TRANSCRIBERS, INC. DATE: September 18, 2026

# EXHIBIT D

**Transcript of September 17, 2026 Hearing**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 26-17635(MBK) |
| | . | |
| 50 SUSSEX REDEVELOPMENT URBAN RENEWAL, LLC, | . | |
| | . | |
| Debtor. | . | Adv. Case No. 26-01323(MBK) |
| . . . . . . . . . . . . . . . | . | |
| 50 SUSSEX REDEVELOPMENT URBAN RENEWAL, LLC | . | |
| | . | |
| Plaintiff, | . | |
| | . | 402 East State |
| v. | . | Trenton, NJ 08608 |
| | . | |
| BRAVO CAPITAL, LLC | . | |
| | . | |
| Defendant. | . | September 17, 2026 |
| . . . . . . . . . . . . . . . | . | 9:29 a.m. |

TRANSCRIPT OF MOTION TO DISMISS ADVERSARY PROCEEDING
BEFORE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Plaintiff Debtor: | Ciardi Ciardi & Astin<br>By: ALBERT ANTHONY CIARDI, III, ESQ.<br>1905 Spruce street<br>Philadelphia, PA 19103 |
| For Defendants BPT 50S Funding, LLC and Bravo Capital, LLC: | Cole, Schotz, Meisel, Forman & Leonard<br>By: STEVEN KLEPPER, ESQ.<br>KRISTA KULP, ESQ.<br>Hackensack, NJ 07601 |
| Audio Operator: | Linda Brakel |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609) 586-2311 Fax No. (609) 587-3599**

THE COURT: Okay. Good morning, everyone.

This is Judge Kaplan and we'll be addressing the 50 Sussex Redevelopment Urban Renewal LLC matter. Let me just adjust my screen. I appreciate everybody's accommodating the Court's calendar, trying to squeeze everything in.

All right. Let me have appearances for the debtor.

MR. CIARDI: Good morning, Your Honor. Albert Ciardi, counsel for the debtor.

THE COURT: Good morning.

MR. KLEPPER: Good morning, Your Honor. Steve Klepper from Cole Schotz on behalf of defendants BPT 50S Funding, LLC and Bravo Capital, LLC. And, Your Honor, also joining me today is Krista Kulp from Cole Schotz.

THE COURT: All right. Good morning, Ms. Kulp.

I also see Mr. Milliaressis. Good morning to you.

MR. MILLIARESSIS: Good morning.

THE COURT: All right. So, this is BPT and Bravo's motion to dismiss the adversary proceeding. There are, if I recall, three counts. A fraudulent or negligent misrepresentation count. A breach of contract count. A tortious interference count. I saw there was also a proposed amended complaint -- I mean, there's also allegations of alter ego but there's an amended complaint seeking a proposed amended complaint seeking to add a conspiracy count.

Let me turn to Mr. Klepper. I've read the pleadings

to date, so anything you wish to amplify or point out or address, please feel free to do so.

MR. KLEPPER: Thank you, Judge. And I'm not going to belabor the Court with a full recitation of our arguments but I would like to highlight certain points here for the Court today. As Your Honor's well aware, defendants contend that debtor's complaint should be dismissed because it fails to allege any viable claim as a matter of law.

We also contend that leave to amend the complaint should be denied as futile because the proposed amended complaint, Your Honor, fails to remedy any of the defects contained in the original complaint. It's essentially exactly the same but adds a proposed new count which is for civil conspiracy. And as I will explain a little bit later and as we did in our papers, that cause of action fails to state a claim.

I just want to clarify and ask one question before I get into the points I wanted to make. My understanding from the plaintiff's response is that they are no longer pursuing their alter ego claim. They say so very clearly in their response. So, I wasn't planning to address that today. We have addressed that claim, obviously, in our papers but, you know, I take counsel at its word that that claim is now off the table.

THE COURT: Mr. Ciardi, are you raising that issue?

MR. CIARDI: No, it's what we said, Your Honor.

We're pursuing it on a conspiracy ground now. We think it more appropriately fits into conspiracy as opposed to alter ego.

THE COURT: All right. Thank you.

MR. KLEPPER: All right.

THE COURT: So, continue with that understanding, Mr. Klepper. Thanks.

MR. KLEPPER: All right. Thank you, Your Honor.

So, while there are three claims, debtor's primary claim is its breach of contract claim which is contained in Count 2 of the complaint. There, debtor alleges that it entered into a contract with Bravo for the purpose of having Bravo assist or represent it in submitting an application to HUD for permanent financing because as, you know, prior to that process, there was a bridge loan that was issued by BPT but, obviously, that's a short term loan and the goal was to seek permanent financing.

The purported contract is the engagement letter which is attached as Exhibit A to the complaint. Debtor contends that Bravo breached this alleged contract in three ways. Failing to provide services required by the contract. Failing to provide appropriate and professional advice and, three, failing so submit the application to HUD, and this is key, on a timely basis. On a timely basis.

Now, it's undisputed that the engagement letter, Your Honor, was negotiated and entered into between highly

sophisticated commercial parties and were represented each by counsel. The parties negotiated and agreed to the specific terms of the engagement letter and we submit that those terms should be enforced here today. So, debtor's breach of contract claim fails for several reasons. First and foremost, the engagement letter clearly provides that it is, quote, non-binding, unquote, and that it is, quote, not intended to be and in no way create a contract of any king, unquote.

Thus, debtor's breach of contract claim rests on a document that these sophisticated parties represented by counsel negotiated and agreed was not a contract of any kind. And for this reason alone, Your Honor, we submit that debtor's claim should be dismissed.

Second, even if the engagement letter were somehow deeming to be a contract, the debtor has failed to allege a breach of any specific term contained in the engagement letter. Debtor's main claim here, Your Honor, is that Bravo failed to submit a loan application to HUD in a timely manner, namely, by September 2025. But the engagement letter contains no time frame whatsoever for submission of a loan -- of a HUD loan application.

In fact, the engagement letter specifically provides to the contrary, quote, borrower acknowledges that lender will not be responsible or liable to borrower if a firm commitment

is not issued or if the insured loan closing does not occur in the manner or within the time frame desired, unquote. Thus, there is no promised deadline to obtain a HUD loan. The engagement letter also reserved to Bravo the right, in its sole discretion to determine at any time that, quote, the property does not qualify for a HUD loan or fails to satisfy any of HUD's requirements, unquote.

So, these sophisticated parties, Your Honor, represented by counsel, negotiated and agreed to give Bravo the sole discretion to determine whether or not to submit an application to HUD. And there's good reason, Your Honor, for these provisions. The HUD loan process is an extremely rigorous process. It takes a long time to process. Bravo, who has an excellent reputation as a HUD lender will not submit an application to HUD that is doomed from the start. There are a lot of components to a HUD loan application.

Importantly, third party reports need to be prepared and they have to be prepared pursuant to HUD's own rigorous standards and they have to be clean. And here, Your Honor, it's undisputed that in or around September 2025, certain third party reports came back with issues, namely environmental problems near the property and debtor's submission of conflicting rent reports.

Now, rather than work with Bravo to try and address these concerns, which debtor could have done, on November 3,

2025, debtor chose to abandon the entire HUD process and proceed instead with financing from a CMBS lender. Debtor cannot now sustain a claim against Bravo arising from problems with debtor's property and its own records which debtor than chose not to address and instead elected to proceed with a different lender. And by the way, the different lender never issued a loan.

Third, Your Honor, debtor also claims that Bravo failed to provide, quote, appropriate and professional advice, unquote. But the complaint fails to identify what advice was given by Bravo, how that advice was inappropriate or unprofessional and what advice, if any, was inappropriately or unprofessionally withheld by Bravo.

And most importantly, what specific provision of the engagement letter required Bravo did give any specific advice to the debtor. The debtor doesn't point to a single word in the engagement letter that requires advice to be given in an appropriate and a professional manner which wasn't done by Bravo. And the reason for this key admission from the complaint, Your Honor, is that the engagement letter contains no such obligation.

So, in sum, debtor's breach of contract claim, we submit should be dismissed because there's no contract to be breached and the document the debtor relies on contains clear terms that squarely refute each of debtor's claim breaches.

Debtor's claim for fraudulent or negligent misrepresentation is contained in Count 1 of the complaint and that fares no better, Your Honor. First, this claim is simply a regurgitation of its breach of contract claim. It merely alleges that there was insincerity in a promise of future performance, which bars a fraud claim under both New York and New Jersey law. Debtor fails to plead a single fact suggesting that Bravo had a contemporaneous intent not to perform when it entered into the engagement letter with debtor. Instead, debtor impermissibly asked the Court to infer that contemporaneous intent.

Secondly, debtor fails to identify a single misrepresentation made by Bravo, whether fraudulent or negligent and, certainly, without the specificity required under Rule 90, there's no who, what, where, when, how. Debtor only points to its own self-prepared purported timeline which it attaches as Exhibit B to the complaint and in conclusory fashion contends that this self-prepared timeline contains representation that the Court should assume or infer were false.

The timeline document, however, contains no misrepresentations that satisfy Rule 90, Your Honor. Quite to the contrary, this timeline document, if you look at it, it underscores that Bravo was, in fact, proceeding with the HUD loan application requirements, all the various steps required

during the period of time that proceeded the debtor's abandonment of the home application process. And that it was doing so on behalf of the debtor.

Third, Your Honor, debtor did not plead reasonable reliance on any Bravo misrepresentation, which is a necessary element of both a fraudulent and negligent misrepresentation claim. Debtor does not even address its failure to plead reasonable reliance on any Bravo misrepresentation. And debtor cannot plausibly plead reasonable reliance because the engagement letter specifically disclaims any representations or warranties and reserves to Bravo the right to discontinue the HUD process at any time and at any reason in its sole discretion.

So, there cannot be any reasonable reliance pled and none is pled. And for those reasons, Your Honor, we submit that Count 1 should also be dismissed.

Debtor also alleges a claim for tortious interference in Count 3 of its complaint and that claim also fails for several reasons. First, Your Honor, the debtor is alleging here an injury that it admits or concedes is not its own injury. As such, the debtor lacks standing to assert that claim.

Debtor claims that defendants interfered with the closing of a loan concerning different properties that do not belong to the debtor. According to the complaint, defendants

interfered, quote, with the lending relationships of the debtor's principal, unquote. And that's at Paragraphs 55 to 57 in the complaint. This claim, Your Honor, does not belong to the debtor. If it belongs to anyone, it's to the debtor's principal or to the entities that own those unrelated properties but it doesn't have any place in this adversary proceeding.

Second, Your Honor, the complaint fails to adequate allege either malice or wrongful means sufficient to support a tortious interference claim. At most, the complaint alleges that defendant's actions were motivated by economic self-interest which does not support a tortious interference claim. The claim here is that Mr. Aaron Krawitz told an investor in BPT, its own investor, that debtor's principals were problematic. And we've laid out the law, that's economic self-interest at best and permissible conduct, Your Honor, and it does not give rise to a tortious interference claim.

So, in sum, we submit that Count 3 of the complaint does not hold water and should also be dismissed.

Finally, Your Honor, debtor seeks leave to amend its complaint to add a new count for civil conspiracy. We contend that leave to amend here, Your Honor, should not be granted for at least two reasons. First, the proposed amended complaint contains the exact same deficiencies as the original complaint. Debtor made no effort to try and cure any of the deficiencies

that we pointed out in opening brief, other than withdrawing its alter ego plan.

And the second reason, Your Honor, is the newly purported civil conspiracy claim fails to state a claim as a matter of law for several reasons. First of all, as Your Honor is very aware, civil conspiracy is not an independent cause of action. It has to be pleaded alongside a stand alone tort claim. And we submit, Your Honor, that because the alleged tor claims here are insufficiently pleaded and should be dismissed for the reasons I stated, and those in our papers, there is no stand alone tort claim that would support debtor's civil conspiracy claim.

The second reason, Your Honor, is a civil conspiracy claim has to allege that there was an agreement between two parties to commit torts. Here, the proposed amended complaint doesn't contain any such allegations. It doesn't contain any allegations of an agreement entered into between the two parties and, as such, it is subject to dismissal. At most, debtor alleges that the parties, quote, worked together to execute their loan-to-own plan and that both parties knew what each other were doing because Aaron Krawitz is CEO to both entities.

But those allegations do not make out an agreement to commit torts and, as such, are insufficient to allege a viable civil conspiracy claim. Rather, what debtor really is doing

here, Your Honor, we submit, is repackaging its breach of contract claim as a tort, which is impermissible under both New York and New Jersey law.

So to conclude, Your Honor, for all the reasons I have argued and those contained in our papers, defendants respectfully submit the debtor's complaint should be dismissed with prejudice and that leave to amend the complaint should be denied as futile. Unless the Court has any questions, I'll hand the podium over to Mr. Ciardi. Thank you.

THE COURT: Thank you, Mr. Klepper.

At this point I'd like to hear from Mr. Ciardi.

MR. CIARDI: Thank you, Your Honor.

THE COURT: Good morning again.

MR. CIARDI: Good morning, Your Honor. Albert Ciardi for the debtor. This is the certification of Mr. Krawitz being submitted as part of a motion to dismiss which is not supposed to be raising factual issues. So, we are here at the motion to dismiss stage, not at a motion for summary judgment, not at a motion for trial, not where the Court should or is permitted to review a 400 page factual certification that permeates this motion to dismiss.

Many of the things that you just heard come out of the Krawitz certification. Outside the realm of the complaint, outside what is the appropriate purview for the Court to consider at the motion to dismiss stage. I'd like to first

address the conspiracy issue because I will to some extent agree with Mr. Klepper that if I don't have my underlying torts, I don't have conspiracy.

But I would like to show you the agreement between the parties, Your Honor, and how ingrained these two parties were so that when you're seeing the facts as I go through them as alleged in the complaint and the appropriate law, you will see that there is an actual conspiracy here. This was a loan-to-own scheme as alleged by the plaintiff. And if Your Honor -- in the complaint that was filed, the Bravo engagement letter is attached -- there is a section and -- I'm a little older now, Your Honor, so I do need the glasses --

THE COURT: No problem.

MR. CIARDI: On what would be Page 6 of 13 of the PDF in the complaint, there is exclusivity. And in the exclusivity section, it indicates that BPT 50S is affiliate of the lender. And lender is defined in the agreement as Bravo Capital, LLC.

So, we have a document attached to the complaint which specifically references that two parties being affiliates and one, the existing lender -- I've used small l there, not the defined term in the agreement -- the existing lender is saying you, debtor, you must use Bravo Capital exclusively. And if you don't use Bravo Capital exclusively, you are subject to financial penalties. That's in the agreement.

So, we have one lender, the actual lender, suggesting

that Bravo must be used and that everything has to roll through Bravo. Considering Mr. Klepper's argument, he indicates in there that, at least according to this document, the way they read it, Bravo had sole absolute control and discretion over the debtor's financing fate. So, imagine that. We have the existing lender and then somebody who's supposed to be the new lender or our broker who is going to be pursuing something for us. The two of them are affiliates and our fate is solely in their hands. But according to them, they had no obligation to do anything.

So, we are required by them to use somebody but they are not required, according to them, to do a thing. Now --

THE COURT: So, isn't the obvious question, why would your client have agreed to that?

MR. CIARDI: Well, because that's not what the engagement letter said, Your Honor. The engagement letter breaks obligations into two pieces. And I think that's why this is not appropriate for a motion to dismiss. And, you know, frankly, the discovery needs to occur.

So, when we look at the letter, it's in three sections. And, again, here I'm referring to Exhibit A to the complaint, Your Honor. There is the engagement letter itself, only a page, there are terms and conditions of the proposed HUD loan and then there are these notice and disclosure transaction fees, costs, general provisions.

And it is on the last -- what would be Pages 9 and 10 that the defendants hang their hat. And if we go to that section and we start where they seem to start, which is, frankly, at the bottom of Page 10 where the notwithstanding language exists, okay? And there is language in there that says nothing is intended to be a contract construed as in a binding agreement but is merely intended to specify certain of the terms and conditions of the transaction contemplated herein and does not necessarily include all the material terms and conditions which will be required in the definitive documents.

That, Your Honor, refers to the loan from HUD. It does not refer to the obligations that are peppered throughout this agreement relating to the obligation to proceed. So, if you go back to the first page, the lender shall prepare and submit a HUD application on your behalf. There’s no reservation in that document.

As we move forward, and now we’re in the terms and conditions. Borrower’s submission requirements -- this is on Page 9 of the letter, Page 10 of the PDF. Upon lender and lender’s counsel’s receipt of all property, borrower and key principal related documents, the loan will be submitted. Not may -- will be submitted to HUD for approval. Then it says HUD may, once application is submitted, request additional information.

Now, dropping back to the top of that first

paragraph, the one that contains where we have the acknowledgment and agreement which has a whole series of this language that includes the notwithstanding, the engagement letter is an indication of lender's intent to process an application under the basic terms described herein. That is them agreeing to proceed. The next one, which ties into the notwithstanding language, says the engagement letter is not a commitment by the lender to make the loan. Any such commitment evidenced by something else.

So, there is clearly, Your Honor, in this engagement letter, two sets of agreements. One which says I am going to process this loan for you. I am going to take on this engagement. I am going to do it. Oh, and by the way, my affiliate, stated, admitted affiliate, is requiring me to be your agent representative, whatever, professional as to HUD. I'm going to do that, but I'm not guaranteeing you that you will get a loan. We understand that. We weren't allowed to get in the room. That's what our problem is, Your Honor.

It is not that HUD didn't issue a loan. It is not that HUD didn't do something or that we were denied or that something happened. It is that we were required to use a certain person, an affiliate of the lender. We did. That affiliate, that agent, Bravo, took our information, started the process -- and I'll get to that point shortly -- but took our information, started the process, and then left us and said,

sorry, we're not submitting it and, guess what, nobody else can.

So, of course, my clients go to try and find some other financing. Interest reserve is running out. That doesn't mean we thought they did a good job or they were fair to us. It means we have to do something to save the property, the investment, the $15 million my clients put in, all the money the unsecured creditors have in this. You know, we have to protect ourselves.

So, if you then move back up in the engagement letter, borrower hereby acknowledges and agreed that lender is the only HUD lender authorized to represent the aforementioned borrower. Only one.

So, in this engagement letter, we have two sets of agreements. I don't think there is any dispute that this is clearly not a commitment to lend. And Bravo is the nominal HUD lender, as that process works.

And, again, I can't say that I am an expert in HUD, but I can say that my understanding is that they would have been the HUD lender processing the loan through HUD with a HUD guarantee.

However, they are also the broker and the agent tasked, not only with an agreement by and between ourselves, but their affiliate required it to happen. So, we are dealing with two agreements here, Your Honor, in this one letter.

And this is not the appropriate procedural vehicle to determine whether that contract issue is or is not, whether our interpretation of this contract, based upon the facts, and then layer in on that Bravo’s, we’ll call it performance, but Bravo’s actions. Let’s say a better word. In doing the things nominally to be done to process a HUD application.

It is one thing to say, I don’t have to do this, and then don’t do it. It is another thing under the law to say, I don’t have to do this, but I am going to do it, I am going to let you rely upon my efforts on your behalf, my expertise, my ability to move this through, and then simply not do it. There is no protection for that under the law as they described it.

So, when the Court looks at the actual contract that we are saying is breached, the arguments raised as to why there is no contract here, or why they are somehow excused from performance, must fail. Especially, at this stage, Your Honor, when the factual record has not been developed.

But, that dovetails almost immediately into the fraud count. Because when you look at the obligations of the parties that the lender required Bravo to be the agent, and that these parties had to use this person, and we’re going to sit behind this agreement and say, nope, no obligations here, we’re just here as a friend, we’ll help you if we feel like it, we can drop you whenever we want. Which, by the way, the only way they could drop us would be to issue a termination letter, and

that did not occur.

But, on that point, that establishes the fraud case. Because while the defendant would like to say, well, let's just look at all of these things isolated, all of the statements, all of the work that was done, the debtor's allegation, the plaintiff's allegation here, is this was a scheme, a loan-to-own scheme.

And the Court should look at everything as a whole. And if the Court looks at everything as a whole, and if the defendant is correct that, oh, I'm sorry, our obligations under this engagement letter were illusory, they were just something we could do if and when we felt like it, and that is not communicated, expressed, at any point in time after Bravo actually begins the engagement, that is evidence of the fraud. That is evidence of the loan-to-own scheme.

And who benefits by the loan-to-own scheme? Back to the conspiracy argument. BPT 50S. Because they are, as stated in the loan agreement and the engagement letter, the affiliate of Bravo, and they are working together. They're under the common control of Mr. Krawitz.

So, the last point I would like to make, Your Honor, which is on the tortious interference aspect of this, is, there are two cases cited by the defendant. And I think one of the most important ones is the Printing Mart-Morristown, because that's the New Jersey Supreme Court case that is -- I really

think sets the standard for how New Jersey courts should look at tortious interference.

And the court, the Supreme Court of New Jersey, has made it very clear that the courts actually, I don't want to say stretch, but are very liberal in finding what constitutes interference, what constitutes a protected right.

And they -- and, again, here I'm citing Your Honor to pages on the New Jersey Reporter side of it, 753 forward. But, the courts look at these cases, and it's really the right protected is the plaintiff's right to pursue business.

Here, the debtor is doing everything it can to get that interest reserve up to preserve its rights. And one of the debtor's affiliates is going out and raising money, and a factual question will be, we know Mr. Krawitz said what he said, that's admitted.

Did he say that as Bravo? Which would have potentially no justification as to the Sigler Golf (phonetic). Or did he say that as BPT?

And the reason that becomes important, Your Honor, is because if the -- if Mr. Krawitz says that as Bravo, our agent, our representative, our representative is actively interfering with our ability to raise the money to take care of the BPT interest reserve. That is and falls within what, at least Printing Mart-Morristown would say, is that economic relationship that the courts in New Jersey will protect.

The Court also goes on further to say at Pages 756 and 757 that this is a factual determination. This requires a review of facts on a case by case basis.

And, again, was Mr. Krawitz saying this as BPT to an investor? Was he saying it as Bravo, our representative? How was he doing it? We don't know that right now, but that's a factual determination.

So, Your Honor, for all of those reasons, the debtor believes, and again, I'm not going to repeat the arguments that are in the brief. I'm really trying to focus on what has been raised in the reply brief. But also to really focus the Court on, in a breach of contract, it is important to look at the contract as a whole, as a, not simply this one sentence taken out of context. But, look at the obligations as a whole.

Look at the two different things in the contract, I'm going to apply, I am the lender. One is clearly non-binding, the I am a lender. The other, I am going to apply, when they say I will do something in the contract, that is a statement of what you are going to do. And we paid the fee. We did the work. We provided the information.

They had an obligation to do the application and to submit it. And that failure, Your Honor, puts us where we are today. Not just jeopardizing the debtor. But all of the unsecured creditors.

And for that, we think that this motion to dismiss

should be denied. The debtor should be permitted to file the amended complaint to correct it from alter ego to conspiracy, and discovery should be allowed to proceed.

And, again, going back to my initial comment, this motion to dismiss incorporates and is based in large part on Mr. Krawitz's certification. And that's introducing facts outside the complaint at the motion to dismiss stage, which is inappropriate and would convert this automatically into a motion to dismiss, which would send us to discovery.

So, for all those reasons, Your Honor, we think the motion to dismiss should be denied.

THE COURT: All right. Thank you, Mr. Ciardi.

MR. KLEPPER: Your Honor, may I briefly --

THE COURT: Yes.

MR. KLEPPER: -- address a couple of points?

THE COURT: I have a couple of questions. But, let me have -- let me allow your response, and then I'll get into my inquiries. Mr. Klepper?

MR. KLEPPER: Thank you, Judge. I'm just briefly going to hit on a couple of points that counsel raised. First of all, counsel's reading from a document engagement letter, which is by its terms non-binding.

Counsel referenced the exclusivity provision in the agreement. The exclusivity provision, as Your Honor pointed out in the question you asked, was something that was agreed to

by the parties when they entered into the bridge loan. They agreed to exclusivity. They agreed, debtor agreed.

And debtor's a sophisticated commercial party represented by counsel. Debtor did not have to sign this engagement letter. Debtor did not have to proceed with Bravo or with BPT. But they chose to.

And they agreed that for a certain period of time, there'd be an exclusivity. That if they were going to proceed with a HUD application, they would use Bravo.

They cannot now try and run away from that provision or say that, you know, they were forced. Nobody forced anybody to do anything in this. Everybody was sophisticated, understood the terms, and agreed to them.

And there's a reason for this exclusivity, Your Honor. The reason is, there's a large commitment of time and resources involved in submitting -- in gathering information to submit to HUD. It's a lengthy, rigorous process.

And Bravo is agreeing to represent debtor in this process. And in so doing, it has to go out, it has to review, it has to collect documents, financials, rent reports, third party reports. It has to engage with third parties to do inspections, et cetera, et cetera, et cetera. It has to fill out a lengthy HUD application form. If it's agreeing to do all of these things, there has to be -- it wanted in return an exclusive right to do that for a certain period of time.

Now, debtor did not have to proceed with Bravo, nor did it have to proceed with the HUD loan. In fact, as debtor concedes in its papers, it abandoned the HUD process. It abandoned the HUD process.

Bravo never abandoned the HUD process. Bravo never issued, as counsel pointed out, a termination letter. Bravo never said, we're not going to issue this application or submit this application.

What was said was, we got to -- you can't submit an application that's doomed from the start. If there are third party reports that are not clean, they have to be cleaned. It sets in the timeline, Your Honor.

They went back to the debtor and said, there's some problems with the report. They needed more money for more investigative work from the third parties. Debtor paid that money. But then debtor abandoned the process. Debtor abandoned the process. And chose to go with another lender.

Now, if they have the right to do that, if they do that, they have to pay an exit fee. Standard in the industry, Your Honor.

Debtor says that -- and points to some language in a document that's not binding that says, upon receipt of -- what's the word, receipt and analysis of all property, borrower, key principal, related documents and information, the loan will be submitted to HUD. Okay?

First of all, it's a non-binding contract. Secondly, the agreement specifically says, reserves the right to Bravo in its sole discretion to determine at any time that the property does not qualify for a HUD loan or fails to satisfy any of HUD's requirements. Sole discretion.

But, they never made that determination. They never terminated, because they wanted to continue working and still -- they wanted to continue working with the debtor to get the HUD loan issued. But, they're not going to submit an application to HUD, in their sole discretion, that is doomed.

Lastly, Your Honor, on the tortious interference claim, I think counsel underscores our argument by counsel's repeated use of the term "our". Our agent is interfering with our ability to raise money.

The problem is, is you have to look at who the our is. The debtor is one entity. Other entities that are affiliated with the debtor that are seeking loans for other properties not owned by the debtor, those are different parties. And it's important to distinguish between the parties if you're going to bring a tortious interference claim.

Counsel and debtor argue in their papers, well, it would have benefitted the debtor because if the debtor's principal could have closed those other loans on those other properties, then that money could have -- those loan proceeds, which do not belong to the debtor, those loan proceeds from

non-debtor affiliates, presumably, could be used by the debtor to service the loan that's at issue here.

But, the debtor doesn't point to any binding agreement between the non-debtor parties and the debtor to have those potential loan proceeds used to service BPT's debt. They don't point to any such agreement. They don't attach any such agreement. They just said, oh, we would have used it.

That's not tortious interference, Your Honor. And we've stated case law to that effect in our papers. Thank you, Your Honor.

THE COURT: Thank you, Mr. Klepper. Mr. Ciardi, I'll give you a last --

MR. CIARDI: Yes. Just two points, Your Honor --

THE COURT: Yes.

MR. CIARDI: -- before your questions. One, the very case cited in the brief of the defendants is Woods Corporate Associates v. Signet Star. And in that case, there were parties that weren't direct, that asserted tortious interference. And were -- the claim was not denied because of those lack of connections. The claim was denied because they couldn't find the actual interference.

So, it was not that the Court -- I mean, if that was so easy of a path, the district court could have done that. So, clearly that's not how the cases interpret that.

But, I really want to touch on counsel's reply

argument, where in referencing the exclusivity and the why of the exclusivity, there is -- the comment was, we provided -- we wanted exclusivity because we were agreeing to do all these things.

We agree with that. They were agreeing to do all those things. We had no problem with them doing all those things. We wanted them to do it. The problem is, they did not do it.

And as to the, did we abandon the HUD, or did Bravo simply tell us, we're not pursuing it, and we had to go to something else? That's a factual issue. Again, Your Honor, I go back to my initial comment. This is not the place where we determine factual disputes. Thank you.

THE COURT: Thank you, Mr. Ciardi. Just a couple of quick questions and one larger question from, we'll call it a 10,000 feet above.

The timeline presented by the debtor through the complaint focuses really -- and the issues are bottomed on what goes on between September and November. Because there's -- doesn't seem to be an ability prior to September necessarily to make the application. And the pressures on the debtor were in that fall, that September through November time period. It's a very short period.

My question is, can you point to any specific representations or any specific contractual provisions which

obligate Bravo to submit the HUD application by a certain date or tie it to the exhaustion of the interest reserve? I mean, is there anything there? Because that seems to be what's -- that seems to be the pressure that prompted the debtor to look elsewhere.

MR. CIARDI: So, Your Honor, I think we would go -- there was no ability to pay once interest reserve ran out. And what I think -- and, again, I think we then dived more into the facts. But, as I understand them as they would come about is that the parties knew that this bridge loan was just that. It was a bridge to a HUD.

THE COURT: But, how do you place the inability to pay once the interest reserve runs out at the feet of Bravo? In other words, what obligation did they have --

MR. CIARDI: Well, so --

THE COURT: -- on that specific -- with that specific restriction?

MR. CIARDI: Okay. Because, Your Honor, if we go back to the inception of the loan, everybody knew when the time was up. We all knew what interest reserve existed. The debtor in that period of time had to get the occupancy of the building to the minimum HUD requirement of, I think, it's 85 percent, which they were actively doing.

So, there's a -- a large chunk of time, and I think as Your Honor recognizes, up until then, where the debtor is

getting the building filled. And then there's this smaller chunk of time, September to November, when the application was supposed to be then submitted with all the information.

So, I think, as the debtor sees it, it is that date and the fact that interest reserve could not be funded from -- or interest payments could not be funded from the debtor's own operations, was a structure of the loan. When you tie in the exclusivity and the fact that we could only use Bravo, and that Bravo engaged itself to be used, I think that gives us -- gets us over the hump there factually, Your Honor.

THE COURT: But, there was no language in the agreement. I'm asking you to confirm.

MR. CIARDI: There is not, Your Honor.

THE COURT: Or representation where the debtors protected itself by requiring certain actions or certain milestones for Bravo's. It seems the debtor had milestones. But, were there any milestones or obligations imposed on Bravo, specifically by September.

MR. CIARDI: No, Your Honor. There's been no timing obligation in there. The obligation was to cooperate with Bravo, provide the information. And when it was completed, it was to be submitted. But, there is no, this needs to be completed by September, this needs to be completed by this date. That's not in there. I have to concede that.

THE COURT: All right. Thank you. So, my larger

10,000 mile high question, so to speak, is, we're all familiar in our circuit, American Capital Equipment decision, that says, courts, bankruptcy courts, should not confirm a plan bottomed on speculative litigation. I mean, that's -- that's what we live with. We're in a single-asset real estate case and your deadline's approaching.

So, this litigation isn't going to be the -- the funding source. Because if I agree with you and I deny the motion to dismiss, we're going through discovery, we're going through motion practice, we're going -- well, you all will. I won't be around. It'll be a trial sometime long past when you need to address the Chapter 11.

So, put this in context. Where are we? What is this being used for?

MR. CIARDI: Well, this is being used for, Your Honor, that there were substantial damages that came out of this. Now, I'm not going to sit here and say that those substantial damages render that claim zero. I don't think the Court's going to say that. And I'm not relying upon that as my plan.

But, a plan that included a level of refinancing that gets to a principal amount, that preserves a piece of this -- and, again, I'm not trying to give you the entire plan, but that also -- well, I guess I am.

But, that also preserves the debtor's ability to pay

a large chunk of the debt with a refinance, pay what the litigation could be as -- could address as a smaller part, for which a lien was retained. And also preserve the rights of unsecured creditors.

That's a plan that this Court would say would not be based solely on litigation. But, has a function of a refinance, and the ability to go and pursue the litigation.

THE COURT: But, the refinance will be predicated on getting a number that results from this litigation. A reduced number.

MR. CIARDI: Well, Your Honor, it will be predicated upon being able to pay a reduced number initially. And then to the extent there is a gap that would be in the single digit millions and not multiple digit millions, that that is addressed by the litigation with the lien rights preserved.

THE COURT: All right.

MR. CIARDI: Again, that's a plan. I'm not saying that Your Honor is prepared to confirm it and that we're --

THE COURT: That's not what we're here for today. But, I wanted to get, like, a little context and at least --

MR. CIARDI: But, it's not something we haven't thought about, Your Honor.

THE COURT: -- alleviate concerns. And I'm sure you have been.

MR. CIARDI: It is. And, again, as Judge Raslavich

told me that we're like -- the debtor's lawyer's like a country in the Middle East. It has to fight wars on all sides and you have to win all of them, Your Honor. I am well aware of that.

THE COURT: Very appropriate these days. All right.

MR. CIARDI: Yes.

THE COURT: Thank you, counsel. I appreciate the argument. I'm reserving at the moment. I would hope to reach a ruling in the short-term. All right?

MR. CIARDI: Thank you, Your Honor.

MR. KLEPPER: Thank you, Your Honor.

THE COURT: Thank you, counsel. Take care. We are adjourned.

* * * * *

**C E R T I F I C A T I O N**

We, ALYCE H. STINE and KIM WEBER, court-approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Alyce H. Stine

ALYCE H. STINE

/s/ Kim Weber

KIM WEBER

J&J COURT TRANSCRIBERS, INC. DATE: September 18, 2026